ESTATE OF W. R. WHITTHORNE, DECEASED, MINNIE L. WHITTHORNE AND EVA WHITTHORNE, EXECUTRICES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SHERWOOD SWAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 101189, 101190. Promulgated August 13, 1941.

*Robert W. MacDonald, Esq.*, for the petitioners.
*Thomas M. Mather, Esq.*, for the respondent.

OPINION.

STERNHAGEN: 1. The taxpayers were in 1936 jointly indebted to Central Bank for $165,081.32 and Swan separately owed that bank $20,000. They compromised this aggregate indebtedness of $185,-081.32 [1] for $75,000 cash and a new joint note of $20,000, thus relieving themselves of an aggregate of $90,081.32, of which $70,081.32 was attributable to the joint note of $165,081.32 and $20,000 was attributable to Swan's separate individual note. The Commissioner determined that Whitthorne's income included the released $35,-040.66, one-half the joint note, and Swan's income included the released $55,040.66, one-half the joint note and all of his separate note.

The taxpayers were jointly indebted to the Bank of America for $89,066.33 and Swan separately owed that bank $65,000. This aggregate debt was settled by the payment of $100,000 cash and the taking by the debtor of the shares of the Hale Bros. Realty Co., Wasserman-Gattmann Co., and Swan's. The shares of the last two corporations were worthless and the shares of the Hale Bros. Realty Co. were recognized as having a value of $34,564.69. The Commissioner determined that Whitthorne realized no income in the settlement of this indebtedness and that Swan's income included the $24,968.47 difference between his share ($109,533.16) of the

[1] The balance due on the face amount of the notes was $212,115.04, but the Commissioner's determination treats the excess as interest and omits it from the computation. Likewise the excess of the face amount of the Bank of America notes is omitted from the computation.

1240

aggregate of $154,066.33 owed and his share ($50,000) of the amount of cash and the value ($34,564.69) of the Hale shares paid by Swan in the settlement.

When a taxpayer settles a debt for less than the full amount, the saving, as a general rule, is income. *United States* v. *Kirby Lumber Co.*, 284 U. S. 1; *B. F. Avery & Sons, Inc.*, 26 B. T. A. 1393; *Highland Farms Corporation*, 42 B. T. A. 1314. The petitioners try to bring themselves within the line of cases holding that income is not realized if the debtor is insolvent before and after the settlement. Swan claims to have had a net insolvency of $10,500.83 and Whitthorne a net worth of $3,500. In each instance, their shares in the corporation are treated as worth $105,000, arrived at by using a value of $200,000 for the corporation's land. The evidence does not, in our opinion, establish insolvency of either petitioner.

The value of the petitioners' shares is not properly fixed by the value of the land on which the corporation operates the market. Other factors must be considered. In view of all the evidence, the opinions of the witnesses as to the value of the land can not be adopted. The earnings of 1935 were over $65,000 and of 1936 over $70,000. The dividends for 1935 were $32,000 and for 1936 were $11,000. The new financing was based upon a recognition of the book value of the market property. The wholesale price of the class A shares to the dealer was $7 and to the public $10. The common shares had commensurate rights which gave them substantial value. It is not necessary to find a definitive value for the corporations' shares, but it is clear that they were worth more than enough to show that as assets in the hands of petitioners they preclude a finding of insolvency and do not affect the gain realized in the settlement of their debts.

The petitioners argue a new conception of the doctrine of realization of income in connection with a debt settlement. They say the essence of the realization is not the settlement of the debts alone, but the freeing of assets, and that such freeing of assets occurred in 1930 when the pledge of the shares was limited by the banks to $100,000. This can not be adopted as the theory of the rule. A solvent taxpayer realizes a gain by a reduction of his debt irrespective of whether the debt is secured by a pledge or mortgage. The freeing of assets which has been regarded in the decisions as a significant fact is not the release of the pledged security from lien, but the effect of enabling the debtor to use all his assets freed from the incubus of the debt. The obliteration of the offsetting liability for debt is what constitutes the gain. If in 1930 the creditor banks had not only agreed to limit the use of the pledged shares to security for $100,000 of the debt, but had also renounced all claim on the

debtor for more than $100,000, the forgiveness would have been a gain, not because the lien was limited, but because the excess amount of the debt was discharged without payment. Having been realized in 1930 it would have been taxable then and not later. But it was not until 1936 that the debt was finally settled; so the resulting gain is properly taxable then.

The petitioners also make a point that the measure of the gain, according to their theory, is not the value of the assets freed, but the cost of them to the petitioners, which was $50,000 to each. The point, however, falls with the theory. Since the release of the pledged shares from the lien is not the occasion of the gain, their particular value or cost is not determinative of the gain. The relevancy of their value when the debt is discharged is only as a factor in considering whether the extent of petitioners' assets demonstrates insolvency; and this, as has been stated, is not true.

The Commissioner's determinations of taxable gain resulting from the settlement of debts to the Central National Bank of Oakland and Bank of America are sustained.

2. The petitioners claim that in the computation of gain resulting from the sale of the new shares the basis has been erroneously distributed between the class A preferred and the common shares. The original 1,000 old company shares cost them $100,000. The petitioners exchanged their old shares for new and agreed with Miller & Co. to sell 25,000 class A shares to it for $175,000 on prescribed terms. They say that in computing the gain from this transaction the basis of $100,000 must all be assigned to the class A shares because the common shares were worthless. By such a computation the basis of the shares sold would be increased and the gain correspondingly reduced, and the unsold common shares would be left with no basis; and any future sale price would be entirely gain. The Commissioner adopted for the distribution of the basis between the two classes of shares the ratio which petitioners used on their returns, viz., 50.84 percent for the preferred and 49.16 percent for the common. This is, in our opinion, the best the petitioners can demand on the evidence.

The corporation's balance sheet showed a surplus of $97,670.45 after assigning $390,000 to capital stock. The assets included the $618,674.83 book value of the market property. Net income each year was about $65,000. This was more than enough to have enabled the corporation to pay dividends equal to the first 60 cents on the preferred and the corresponding first 60 cents on the common. Additional dividends were to be equal on the two classes of shares. Other rights of the shareholders were very much alike, except the liquidation preference of the class A. The fact that the common

shares were not actually sold is no indication of a lack of market or of value, when the preferred were so promptly sold at $10 a share on the open market. The basis used by the Commissioner is sustained.

3. The petitioners contend that in 1936 they sold only 12,500 of the class A shares and that their tax may not be measured by a profit from the sale of 25,000 shares. In this we think they are correct. The contract with Miller & Co. was not a sale of the entire 25,000 shares. In fact only 12,500 were delivered in 1936 and, since this was well within the 90-day period, there was no duty of the dealer to take any more in that year. It fulfilled its contract in 1937 by taking the remaining 12,500 and paying for them in that year. It can not be said that the latter were sold in 1936 or that petitioners in that year derived the profit from their sale. They had made a contract to sell, but there is no evidence that this was intended to be an immediate sale. It is error to treat it as such. *Commissioner* v. *Segall*, 114 Fed. (2d) 706; *Shillinglaw* v. *Commissioner*, 99 Fed. (2d) 87; *Dahlinger* v. *Commissioner*, 51 Fed. (2d) 662; certiorari denied, 284 U. S. 673; *Stiver* v. *Commissioner*, 90 Fed. (2d) 505.

The gain in 1936 should be reduced to that applicable to a sale of 12,500 shares.

4. The Commissioner determined a penalty of 5 percent under section 291, Revenue Act of 1936, for failure of petitioners to file their returns on time. The evidence does not establish that the delay was due to reasonable cause and not to willful neglect, and the penalty is therefore sustained.

*Decision will be entered under Rule 50.*