## CAPITOL COAL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 51955.   Filed September 25, 1956.

*Harry Janin, Esq.,* for the petitioner.
*Richard G. Maloney, Esq.,* and *Clarence P. Brazill, Jr., Esq.,* for the respondent.

MULRONEY, *Judge:* The issue presented is whether the respondent was correct in disallowing a net operating loss deduction claimed by the petitioner for the fiscal year ended May 31, 1944, in the amount of $29,992.14 on the ground that such loss deduction is eliminated by including in the petitioner's income for the fiscal years ended May 31, 1942, and May 31, 1943, the respective amounts of $28,037.49 and $5,500 as income realized by the petitioner through the cancellation of indebtedness by creditors in those years. In the year ended May 31, 1942, creditors of the petitioner agreed to accept payment of $26,264.27 in full settlement of open account obligations in the amount of $96,908.63, which resulted in a cancellation of obligations in the amount of $70,644.36. After the debt cancellations, the petitioner was solvent in the amount of $28,037.49. In the fiscal year ended May 31, 1943, a creditor canceled a note indebtedness of the petitioner in the amount of $5,500. Respondent included these amounts, $28,037.49 and $5,500, in the petitioner's income for the respective years. There is no dispute about the correctness of these two amounts.

Petitioner argues that the debt cancellations in the years involved were a gratuitous relinquishment by the various creditors of a portion of the claims owing to them and were therefore excludible from income as gifts within the meaning of section 22 (b) (3) of the 1939 Internal Revenue Code. In the alternative, petitioner makes the argument that the obligations which were canceled arose through purchases of coal and oil in a year when petitioner's operations in the coal and oil business resulted in a profit of only $2.03 and, consequently, under the tax benefit rule, the cancellations of these obligations cannot result in taxable income to the petitioner greater than the amount of $2.03.

Petitioner is not prevented from making any of these contentions here by the fact that it treated the amount of $28,037.49 in its return filed for the fiscal year ended May 31, 1942, as income from the cancellation of indebtedness. *Denman Tire & Rubber Co.*, 14 T. C. 706, affirmed on other issues 192 F. 2d 261.

To support its contention that the portion of the obligations canceled by the creditors in the fiscal year ended May 31, 1942, in the amount of $70,644.36 was a gift, the petitioner cites *Helvering* v. *American Dental Co.*, 318 U. S. 322. In that case the Court held that "The forgiveness was gratuitous, a release of something to the debtor for nothing, and sufficient to make the cancellation here gifts within the statute." We must view this decision, however, in the light of *Com-*

*missioner* v. *Jacobson*, 336 U. S. 28, which emphasized that the cancellation of an obligation may be regarded as a gift only if the intent to make a gift is present. *Standard Brass & Manufacturing Co.*, 20 T. C. 371, affd. 218 F. 2d 352; *Denman Tire & Rubber Co., supra.* In the *Jacobson* case the Court said that the question is factual and "turns upon whether the transaction is in fact a transfer of something for the best price available or is a transfer or release of only a part of a claim for cash and of the balance 'for nothing.' "

We are convinced that the creditors, other than petitioner's brother, obtained the best settlement available of their outstanding claims against the petitioner in the years here involved. There is lacking any intent, either express or implied, on the part of these creditors to make a gift of a portion of the claims to the petitioner, and we so find. The various negotiations between the said creditors and the petitioner indicate a continued effort on the part of the creditors to realize in full their claims against petitioner. Under the formal extension agreement dated July 21, 1939, the George E. Warren Corporation, L. F. Kaine & Co., and the other creditors took over the control of the petitioner's operations and undertook to recover their existing debts in full at the rate of $2\frac{1}{2}$ per cent each month beginning October 10, 1939. The Warren corporation, the Kaine company, the Cities Service Oil Co., and other creditors made up the majority of the board of directors under the extension agreement. Petitioner's stock was placed in escrow to guarantee faithful performance of the agreement. Petitioner was unable to meet the installment payments under the extension agreement, and prior to May 27, 1942, Benjamin Sabsevitz, petitioner's vice president and secretary, and Godwin, attorney for the petitioner, approached the George E. Warren Corporation, L. F. Kaine & Co., Cities Service Oil Co., and the Foreston Coal Co. to work out a reduction of petitioner's indebtedness to these creditors. Petitioner's representatives repeatedly stressed the inability of the petitioner to continue in operation unless the creditors would consent to some debt reduction, and "pleaded" for a chance to stay in business. The three creditors approached by petitioner were fully aware of petitioner's poor financial condition. Barber, who represented both the Warren and the Kaine corporations in these discussions, finally agreed to reduce the petitioner's claims. This settlement was considered by the creditors involved as "the best plan that we could possibly work out for the benefit of the creditors and for the benefit of the [petitioner]."

Under a written agreement dated May 27, 1942, the Warren corporation agreed to accept $15,000 in notes as "full settlement" of its claims against petitioner amounting to $55,538.14, and the Kaine corporation agreed to accept $4,307 in notes as "full settlement" of its claims amounting to $15,951.88. Again the petitioner's stock was placed in

escrow to insure faithful performance of the contract. Spellman, representing Cities Service Oil Co., also agreed in the fiscal year ended May 31, 1942, to accept $6,957 in full settlement of its claim against the petitioner amounting to $24,418.61. In making this settlement Spellman testified that he was protecting the best interests of Cities Service and was fulfilling his duties as general credit manager of his employer. The nature of the negotiations between the creditors and the petitioner, as well as the formal tenor of the settlement agreements themselves, indicate an effort on the part of the creditors to salvage as much as possible from a bad situation. It is unlikely that the officers of these creditor corporations would make a gift to petitioner of a portion of these obligations. See *Commissioner* v. *Jacobson, supra;* see also *J. C. Bradford*, 22 T. C. 1057, reversed on other grounds (C. A. 6, 1956) 233 F. 2d 935.

Petitioner seeks to establish that the cancellations were gifts by pointing out the friendly relations existing between it and each of the three creditors who made these cancellations and by emphasizing the fact that these creditors wanted to benefit the petitioner by permitting it, through these debt cancellations, to remain in business. But the mere fact that the creditors knew that petitioner stood to benefit by these cancellations does not imply that the cancellations must be regarded as gifts. *Spear Box Co.*, 13 T. C. 238, affd. 182 F. 2d 844. Petitioner also argues that these creditors knew they could recover a large portion of their claims by forcing the petitioner to liquidate and that their unwillingness to do so indicates a gift of a portion of the obligation to the petitioner. Simply because the creditors did not force the petitioner to liquidate does not imply that these creditors did not make the best settlement possible. By making the settlements they did the creditors avoided the uncertainties and difficulties of taking steps to enforce collection from petitioner through liquidation proceedings. See *Denman Tire & Rubber Co., supra*. They exercised their best judgment as to the best settlement available under all the circumstances.

In March 1943 the George E. Warren Corporation canceled notes due it from the petitioner in the amount of $5,500. These notes had been issued by the petitioner on May 27, 1942, under the terms of the settlement agreement of that date. Sabsevitz, representing petitioner, asked Barber for further help and "Told him that we needed a little more help to get over that brink, and he was agreeable to go along with our request and reduce the indebtedness by that amount." At another point he testified that he "pleaded" with Barber "on twenty occasions" to obtain further relief on his outstanding note obligations. Barber again reviewed petitioner's poor financial condition, discussed the matter with his employer, the Warren corporation, and then agreed to

the cancellation. In doing so Barber thought "it was in the best interests" of both the Warren corporation and the petitioner to cancel the note obligation. We are convinced that the creditor again manifested no intent, either express or implied, to make a gift of this amount to petitioner but, instead, was making the best arrangement possible in view of petitioner's continued financial weakness.

The fourth creditor, Irving Sabsevitz, also agreed in that same year to cancel his claim against petitioner in the amount of $1,000. He too was fully aware of the petitioner's financial difficulties, and as the brother of Benjamin Sabsevitz, who was petitioner's vice president, Irving was largely motivated by personal considerations in canceling the obligation. Irving Sabsevitz testified in this case and the gist of his testimony is that the cancellation of the note was a gift. He said: "I wouldn't want to hurt him. He is my brother." We can conclude from his testimony a gift was intended but it will not change the result in this case since, as will appear later in the Opinion, only $28,037.49 of the total debts canceled in the fiscal year 1942 (in the sum of $70,644.36) is includible in petitioner's income for that year.

In all, the four creditors in the fiscal year ended May 31, 1942, canceled debts due them by the petitioner amounting to $70,644.36, and immediately after the cancellations the petitioner was solvent to the extent of $28,037.49. It is well established the gain the insolvent debtor realizes from the cancellation of debts is no more than the excess of assets over liabilities after the cancellation of indebtedness. *Lakeland Grocery Co.*, 36 B. T. A. 289; *Fashion Park, Inc.*, 21 T. C. 600. When the George E. Warren Corporation canceled petitioner's note indebtedness of $5,500 in the fiscal year ended May 31, 1943, the petitioner was solvent in an amount greater than the cancellation. We hold that the cancellations of indebtedness by the petitioner's creditors in the fiscal years ended May 31, 1942 and 1943, resulted in the realization of ordinary income to the petitioner in the amounts of $28,037.49 and $5,500, respectively.

Petitioner argues, in the alternative, that if the cancellations are not deemed gratuitous "the amount of taxable income attributable to the cancellations should be limited to $2.03 under the tax-benefit doctrine." It has been stipulated that out of a total of $70,644.36 in debts canceled in the year ended May 31, 1942, a portion of such debts, in the amount of $69,644.36, arose during the period from June 1, 1938, to May 31, 1939, from sales of coal and oil by the three creditors involved to the petitioner in that fiscal year. Petitioner's argument is that the $69,644.36 of debts canceled represented the cost of the coal and oil purchased and appeared as a part of the cost of goods sold in determining the profit or loss from petitioner's operations as a coal and oil dealer for the fiscal year ended May 31, 1939, and since those

operations resulted in a loss of $69,642.33, the petitioner contends that it derived no tax benefit except to the extent of $2.03.

Petitioner cites *Dobson* v. *Commissioner*, 320 U. S. 489, and *Bowers* v. *Kerbaugh-Empire Co.*, 271 U. S. 170, in support of its argument. We do not believe that the principles of those cases are applicable here. In *Kerbaugh-Empire Co.*, *supra*, the taxpayer borrowed marks from a German bank prior to 1921 to finance construction work by a German subsidiary. The borrowed sums were expended by the subsidiary and were subsequently lost. The subsidiary was allowed the losses in its income tax return, and the losses so allowed were in excess of taxable income. In 1921 the German mark fell in value and on the basis of an exchange rate of 2½ cents per mark the taxpayer paid its indebtedness, which had been incurred when more dollars were required to buy the mark, to the German bank. The Commissioner determined that the taxpayer had a taxable gain in the year of the settlement, but the Supreme Court held for the taxpayer on the ground that "The result of the whole transaction was a loss."

It appears in the instant case that the petitioner made net sales of $982,406.28 in the fiscal year ended May 31, 1939, and from this amount deducted cost of goods sold in the amount of $811,769.91, resulting in a gross profit on sales in the amount of $170,636.32. From this amount the petitioner deducted selling, delivery, and yard costs, as well as general and administrative expenses, which, with a minor adjustment not pertinent here, converted the gross profit into a net loss of $69,642.33 for the fiscal year. In *Church's English Shoes, Ltd.*, 24 T. C. 56, affd. (C. A. 2, 1956) 229 F. 2d 957, where we held that the *Kerbaugh-Empire Co.* case was inapplicable, we said:

In this case, petitioner has not shown that the merchandise which it purchased in 1935 was sold at a loss, if it was. Petitioner only shows that there was an operating loss sustained for all of its business for each fiscal year ending on June 30, 1936 and 1937. Such net operating losses may have been the result of unprofitable transactions other than sales of the goods bought in 1935, in question. In *Kerbaugh-Empire Co.*, the evidence established that construction work which was financed by the use of foreign exchange resulted in a loss which exceeded the gain realized upon the purchase of foreign exchange used to pay notes given to obtain financing. We do not have here a like situation in fact, and conclude that *Kerbaugh-Empire Co.*, *supra*, does not apply to the facts of this case.

In the present case, the indebtedness of $69,644.36 canceled subsequently by the three suppliers of coal and oil represents only a small portion of the coal and oil purchased in the fiscal year 1939 and we cannot say that the coal and oil represented by this amount was sold at a loss. As in *Church's English Shoes, Ltd.*, *supra*, the petitioner seeks to invoke the rule of *Kerbaugh-Empire* merely by showing an operating loss for all of its business in the fiscal year ended May 31,

1939. We believe the rationale of the *Church* case is applicable here. It is not shown that the coal and oil purchased in the fiscal year 1939, which gave rise to an indebtedness of $69,644.36, was sold at a loss and consequently we cannot say that losses from the purchase and sale of coal and oil supplies in the fiscal year 1939 absorbed the gain of $69,644.36 realized by the petitioner in the cancellation of indebtedness by the suppliers in the fiscal year 1942. We conclude that *Kerbaugh-Empire Co., supra,* does not apply here.

Nor do we believe that the petitioner's argument here can be supported by the tax benefit rule as expanded in *Dobson* v. *Commissioner,* 320 U. S. 489.[1] There the taxpayer bought bank shares which he subsequently sold at a loss in 1930 and 1931. These losses were allowed in his income tax returns for those years but even if the entire amount of deductions claimed on account of these losses had been disallowed the returns of the taxpayer would still have shown net losses. In 1936 he discovered that he had been induced to make the stock purchases by fraudulent representation and brought suit against the seller. In 1939 the taxpayer recovered a portion of the original cost of the stock and the Commissioner determined that this recovery, with adjustments not relevant here, constituted ordinary income. The Supreme Court held for the taxpayer and pointed out that "no statute or regulation having the force of one and no principle of law compels the Tax Court to find taxable income in a transaction where as matter of fact it found no economic gain and no use of the transaction to gain tax benefit." In *Birmingham Terminal Co.,* 17 T. C. 1011, we said:

To be sure, section 22 (b) (12) of the Internal Revenue Code, which was intended to achieve a like result in certain circumstances, is literally not applicable here,

---

[1] The tax benefit rule appears in the 1939 Internal Revenue Code as follows:

SEC. 22. GROSS INCOME.

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this chapter:

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(12) RECOVERY OF BAD DEBTS, PRIOR TAXES, AND DELINQUENCY AMOUNTS.—Income attributable to the recovery during the taxable year of a bad debt, prior tax, or delinquency amount, to the extent of the amount of the recovery exclusion with respect to such debt, tax, or amount. For the purposes of this paragraph:

(A) Definition of Bad Debt.—The term "bad debt" means a debt on account of worthlessness or partial worthlessness of which a deduction was allowed for a prior taxable year.

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

(C) Definition of Delinquency Amount.—The term "delinquency amount" means an amount paid or accrued on account of which a deduction or credit was allowed for a prior taxable year and which is attributable to failure to file return with respect to a tax, or pay a tax, within the time required by the law under which the tax is imposed, or to failure to file return with respect to a tax or pay a tax.

(D) Definition of Recovery Exclusion.—The term "recovery exclusion", with respect to a bad debt, prior tax, or delinquency amount, means the amount, determined in accordance with regulations prescribed by the Commissioner with the approval of the Secretary, of the deductions or credits allowed, on account of such bad debt, prior tax, or delinquency amount, which did not result in a reduction of the taxpayer's tax under this chapter (not including the tax under section 102) or corresponding provisions of prior revenue laws, reduced by the amount excludible in previous taxable years with respect to such debt, tax, or amount under this paragraph.

but it was made plain in *Dobson* v. *Commissioner*, 320 U. S. at 505–506, that the addition of these provisions to the Code did not preclude the application of a similar rule in other comparable cases.

Petitioner contends that this is a "comparable" case and therefore within the expanded tax benefit doctrine. We cannot agree. In *Merton E. Farr*, 11 T. C. 552, affirmed sub nom. *Sloane* v. *Commissioner*, 188 F. 2d 254, we said:

[*Dobson* v. *Commissioner*, 320 U. S. 489] stated that no principle of law compelled the courts to find taxable income in a transaction where, as a matter of fact, it found no economic gain and no use of the transaction to gain a tax benefit. Regardless of the possible extensions of the tax benefit rule by the *Dobson* case, one certain requirement for invoking it is that there be such an interrelationship between the event which constitutes the loss and the event which constitutes the recovery that they can be considered as parts of one and the same transaction. This point was made clear in the *Dobson* case, *supra*, on page 502, where the Court said:

"* * * Whether an apparently integrated transaction shall be broken up into several separate steps and whether what apparently are several steps shall be synthesized into one whole transaction is frequently a necessary determination in deciding tax consequences. * * * The Tax Court analyzed the basis of the litigation which produced the recovery in this case and the obvious fact that 'regarding the series of transactions as a whole, it is apparent that no gain was actually realized.' * * *"

In all the cases cited by petitioner as authority for applying to the instant case the concept that where there is no economic gain there is no taxable income, the fact situations reveal a close integration of events producing the loss and the gain. In each instance the property on which the loss was suffered can be traced into the transaction producing the gain; the loss and the gain could be attributed to the same *res*.

We cannot find any interrelationship here between any losses incurred by the petitioner in the purchase and sale of coal and oil in the fiscal year 1939 and the cancellation of indebtedness amounting to $69,644.36 in the fiscal year 1942. As we have pointed out, petitioner's net sales in the fiscal year 1939 amounted to $982,406.23 and its cost of goods sold (including coal and oil purchases, freight, towing, boating, and insurance) was $811,769.91. There is no res which we can pick out of the sales in the fiscal year 1939 and trace it to the gain resulting from the cancellation of indebtedness in the years here involved. All that appears in the record is a lump sum showing total sales from all of petitioner's operations in the fiscal year 1939. These resulted in a gross profit and it is conceivable that the net losses which were suffered by petitioner in that year were a consequence of sales not connected at all with the products purchased by petitioner from George E. Warren Corporation, L. F. Kaine & Co., and Cities Service Oil Co., which are the three creditors involved in the indebtedness cancellations. It must be remembered that petitioner purchased its supplies from various suppliers other than the ones just mentioned.

We are unable to find a common denominator between any item sold by the petitioner at a loss in the earlier year and then involved in a gain in the subsequent year. We conclude that the facts of this case do not bring it within the tax benefit doctrine as expanded by *Dobson* v. *Commissioner, supra.*

Petitioner does not contend that the cancellations in the fiscal years 1942 and 1943 were really an adjustment of the purchase price of coal and oil purchased in the earlier years. See *Hirsch* v. *Commissioner*, 115 F. 2d 656. The facts of this case do not warrant an application of the price adjustment theory set forth in the *Hirsch* case.

Respondent concedes that the petitioner, in computing its equity invested capital for excess profits tax purposes in the years here involved, is entitled to include in the computation the aggregate amount of debt cancellations by its creditors.

*Decision will be entered under Rule 50.*