HARRY L. BIALOCK AND NANCY L. BIALOCK, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 72360. Filed January 27, 1961.

*Thomas A. Sully, Esq.*, for the petitioners.
*Victor H. Frank, Jr., Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax for the calendar years 1952 and 1953 in the respective amounts of $6,600.10 and $34,541.46. The basic issue is whether the business conducted in the name of Astell Refractories Company was conducted by the petitioner Harry L. Bialock as a sole proprietorship or whether it was conducted by him and his two minor children as a partnership, the decision of which will determine whether the petitioner is entitled to deduct the full amount of losses sustained by the business and is taxable upon the full amount of gain. Another issue is whether gain derived in 1953 when the assets were transferred to a creditor, who canceled indebtedness, resulted in ordinary income from discharge of such indebtedness.

#### FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by this reference. The petitioners are husband and wife residing in Glen Ridge, New Jersey. They filed joint income tax returns for the calendar years 1952 and 1953 with the district director of internal revenue at Newark, New Jersey. Since Nancy L. Bialock is a party

to this proceeding only because she and her husband filed joint income tax returns for the years 1952 and 1953, Harry L. Bialock will hereinafter be referred to as the petitioner.

During the years 1952 and 1953 the petitioner was primarily engaged in the business of selling boiler tubes and other types of steel tubing to the boiler and other industries. This business was conducted through John B. Astell and Company, Incorporated, the stock of which was owned by petitioner.

In the latter part of 1951 petitioner decided to enter the business of purchasing, warehousing, and selling refractories (firebricks). He entered into an agreement with the Laclede-Christy Company of St. Louis, Missouri (hereinafter referred to as Laclede), whereby he would purchase, warehouse, and sell refractories manufactured by that company. Letters were exchanged between petitioner and Laclede, but they did not enter into a written contract. On or about February 1, 1952, the petitioner organized a business, under the name of Astell Refractories Company, to engage in such business and the petitioner, on behalf of the company, leased warehouse space in Brooklyn, New York, for the warehousing and storage of refractories. No trade style or name was ever registered.

At the time petitioner was organizing this business he discussed with two attorneys in St. Louis the formation of a partnership through the creation of two trusts, one for the benefit of each of his minor children, James G. Bialock, age 15, and Ann Bialock, age 9, the trustees of each trust to be partners in the partnership. As a result of these discussions the attorneys forwarded to petitioner two proposed indentures of trust, bearing date of January 31, 1952, between petitioner as donor and Carolyn Meisel and Irl B. Rosenblum, as trustees, one for the benefit of petitioner's son, James G. Bialock, and the other for the benefit of his daughter, Ann Bialock, designated as "Bialock Trust No. 1" and "Bialock Trust No. 2." Under the terms of each trust agreement petitioner was to donate $2,500 to each trust. A proposed partnership agreement, bearing date of February 1, 1952, was also forwarded to petitioner by his attorneys, the named partners being the petitioner and Carolyn Meisel and Irl Rosenblum as trustees of the two proposed trusts, to do business in the firm name and style of Astell Refractories Company. Under the provisions of this proposed agreement, the petitioner and each of the two trusts were to make a capital contribution of $2,500. Net profits or losses were to be divided equally among the petitioner and the two trusts. Neither of the two trust indentures nor the partnership agreement was ever executed.

The petitioner discussed the proposed trust indentures and partnership agreement with his accountant, and as a result thereof he had the accountant draw up a new proposed partnership agree-

ment. This document, a printed partnership agreement form, is dated February 1, 1952, and was signed by the petitioner individually. He also signed thereto the name "Ann Bialock per H. L. Bialock Guardian" and the name "James G. Bialock per H. L. Bialock Guardian," although he was never appointed legal guardian of the children. The notary form at the end of the agreement was filled in, but does not bear the signature or seal of a notary public. This document states that the petitioner and Ann Bialock and James G. Bialock have agreed to become copartners in business under the firm name of Astell Refractories Company, the partnership to commence on February 1, 1952, and continue until dissolved. It provides that all gains and profits shall be divided among them equally, that each will bear, pay, and discharge equally, all rents and other expenses required for the support and management of the business, but that all loss caused "by ill-commodities, bad debts or otherwise" shall be borne by the petitioner. It also provides that during the existence of the copartnership none of the parties shall dispose of his share without written consent of the other parties, that upon termination of the partnership all property, after equal division of profits to date, shall be distributed to the petitioner, and that upon the death of any partner the surviving partners shall have the privilege of purchasing the interest of the deceased partner. This document was signed by the petitioner at or about February 1, 1952, was delivered to his attorney in January 1958, but the respondent's representative had no knowledge thereof until February 1960.

On February 11, 1952, the petitioner caused his accountant to file in the office of the county clerk of the county of New York, a "Business Certificate for Partners," bearing the signatures of the petitioner and his two children, in which it was stated that they were conducting business as members of a partnership under the name of Astell Refractories Company, and setting forth the ages of James G. Bialock and Ann Bialock as 15 years and 9 years, respectively. This certificate was executed and notarized by the parties on January 15, 1952, although not filed until February 11, 1952.

During the period from approximately February 1, 1952, until May 31, 1952, Astell Refractories Company purchased refractories from Laclede. Thereafter, up to December 15, 1953, all shipments of refractories by Laclede to Astell Refractories Company were made upon a consignment basis. During this period Laclede also advanced operating capital to Astell Refractories Company when needed. No notes or other instruments of indebtedness were given to Laclede. As of December 15, 1953, there was owing to Laclede and a wholly owned subsidiary an amount of $141,945.45 for materials and money which had been furnished to Astell Refractories Company. The petitioner represented to the accounting firm employed by Laclede that the busi-

ness was conducted by himself and his two children as equal partners.

The following advances were made by the petitioner to Astell Refractories Company:

*1952*

| | |
|---|---|
| Jan. 2 | $5,000.00 |
| Jan. 14 | 2,585.82 |
| Mar. 11 | 2,000.00 |
| Mar. 31 | 2,000.00 |
| Apr. 1 | 2,000.00 |
| Apr. 28 | 1,000.00 |
| May 9 | 1,000.00 |
| July 24 | 1,200.00 |
| Aug. 20 | 600.00 |
| Total Dec. 31 | 17,385.82 |

The petitioner in 1952 and 1953 made statements to Dunn and Bradstreet that the business was conducted as a partnership, and in general held himself out as doing business in partnership.

During the calendar year 1952 the operating loss of the business conducted by Astell Refractories Company amounted to the sum of $22,972.29. During the period commencing January 1, 1953, and ending December 15, 1953, the business conducted by Astell Refractories Company resulted in a net loss of $41,463.85. Statements put in evidence (the one for the year 1952 being attached to petitioner's return) set forth the details of the net loss computations for each year. They show that the net losses resulted from the excess of "Operating Expenses" over gross profit on sales. Such operating expenses were in the respective amounts of $26,467.29 and $62,280.75, consisting of ordinary expenditures for salaries, rent, freight, and the like, but not including any bad debt or other losses.

In December 1953 petitioner commenced discussions with the president and manager of Laclede concerning the discontinuance of the business of Astell Refractories Company, because he had concluded that it was unprofitable for an individual to conduct a warehouse business, because it had become so competitive. On or about December 15, 1953, an agreement entitled "Contract of Purchase and Sale" was executed between Laclede and "Astell Refractories Company, a partnership," by the petitioner as "Its Authorized Partner," which provided in part as follows:

WHEREAS, the liabilities of Astell exceed its assets; and

WHEREAS, Astell desires to sell and Laclede desires to purchase and acquire said business property and rights upon the basis hereinafter stated:

Now, THEREFORE, This Agreement WITNESSETH:

1. In consideration of the sum of One Dollar ($1.00) * * * and of the mutual covenants herein contained, including the assumption by Laclede of the liabilities of Astell, as hereinafter provided, Astell has by these presents sold and Laclede has purchased all of the assets of the aforesaid business, including,

without limitation, any and all leases of the premises where the business is carried on; all monies, bills, notes, negotiable instruments and securities for money, accounts receivable and choses in action; all contracts; all books of account, paper and documents relating to such business; the name "Astell Refractories"; and all inventory, materials, supplies, machinery, equipment, motor vehicles, tools, designs, patterns, patents, fixtures, office furniture, and all other property and effects of every nature and description owned and used by Astell in relation to the said business and wheresoever situated.

2. * * * Astell warrants that the assets of said business are not less than stated in the informal balance sheet dated December 15, 1953, which balance sheet is attached hereto and marked Exhibit "A" and that the liabilities of Astell Refractories Company do not exceed the amount shown as liabilities on said informal balance sheet attached hereto as Exhibit "A"; and, to the extent that said liabilities exceed the liabilities as shown on said attached informal balance sheet marked Exhibit "A", Astell, including its partners, jointly and severally, covenants that it will indemnify and hold harmless Laclede against all lawful actions, claims and demands in respect thereof * * *.

* * * * * * *

4. Laclede agrees to assume and pay all lawful debts and liabilities of Astell in relation to said business to the extent that the same are reflected on the books of the Company and in an amount not to exceed the total liabilities as shown on the informal balance sheet attached hereto as Exhibit "A".

The balance sheet referred to in the above December 15, 1953, agreement provided as follows:

ASTELL REFRACTORIES COMPANY (A PARTNERSHIP) BALANCE SHEET

DECEMBER 15, 1953

(UNAUDITED)

*Assets*

| | | | |
|---|---|---|---|
| Current assets: | | | |
| Cash in bank | | | $2,132.46 |
| Accounts receivable, less allowance for doubtful accounts, of $3,000 | | | 32,553.10 |
| Inventory (at lower of cost or market) | | | 58,409.61 |
| Advances to employees | | | 481.65 |
| Sundry debtors | | | 29.87 |
| Prepaid expenses | | | 320.90 |
| Total current assets | | | 93,927.59 |
| Property and equipment—at cost: | | | |
| Furniture and fixtures | $1,500.52 | | |
| Less accumulated depreciation | 152.12 | $1,348.40 | |
| Machinery and equipment | 4,257.46 | | |
| Less accumulated depreciation | 1,458.21 | 2,799.25 | 4,147.65 |
| Deposits | | | 710.00 |
| | | | 98,785.24 |

*Liabilities and Capital*

Current liabilities:

| | | |
|---|---|---|
| Trade accounts payable | | $1,827.93 |
| Taxes payable | | 1,919.18 |
| Accrued insurance and other expenses | | 143.00 |
| Laclede-Christy Company, St. Louis: | | |
| Special term account | $49,260.10 | |
| Open account | 66,534.50 | |
| Advance account | 4,653.04 | |
| | 120,447.64 | |
| Laclede-Christy Co. of Pa | 21,497.81 | 141,945.45 |
| Total current liabilities | | 145,835.56 |
| Deficiency in capital: | | |
| Partners' capital account balance at January 1, 1953 | [1]5,586.47 | |
| Net loss for the period January 1, 1953 to December 15, 1953 | [1]41,463.85 | [1]47,050.32 |
| | | 98,785.24 |

[1] Denotes red figure.

Following the execution of the agreement of December 15, 1953, Laclede took over all the assets of Astell Refractories Company and continued to operate the business for about 2 years thereafter. Petitioner was employed in the business of Astell Refractories Company by Laclede for at least a year and received a salary of $10,000.

At December 31, 1953, an amount of $46,851.93 was charged by Laclede to its reserve for bad debts, being the approximate difference between the amount of the indebtedness of Astell Refractories Company to Laclede on December 15, 1953, and the value of the assets transferred by Astell Refractories Company to Laclede pursuant to the December 15, 1953, agreement.

No partnership tax returns were filed by or for Astell Refractories Company for the years 1952 and 1953. In their joint income tax returns for the calendar years 1952 and 1953, the petitioners represented that the business of Astell Refractories Company was conducted by the petitioner Harry L. Bialock as a sole proprietorship, and therein claimed as deductions the full amount of losses sustained by that business in the respective amounts of $22,972.29 and $41,463.85. In their joint return for the year 1953, the petitioners did not report any gain from the transfer to Laclede of the assets and liabilities of the business of Astell Refractories Company. In a protest filed by the petitioner with the respondent on September 5, 1957, the petitioner represented that the business was conducted by him as sole proprietor.

The respondent in the notice of deficiency disallowed two-thirds of the loss claimed as a deduction for each of the years 1952 and 1953, stating as follows:

It has been determined that the Astell Refractories Company, considered by you to be a sole proprietorship during the years 1952 and 1953, was in fact a partnership in which Harry L. Bialock participated in profits and losses to the extent of thirty-three and one-third percent. Consequently, the claimed losses from the operations of the business of $22,972.29 and $41,463.85 in 1952 and 1953 have been disallowed to the extent of $15,314.86 and $27,642.57, respectively.

In such notice the respondent increased the reported income for the year 1953 by $47,050.32 with the following explanation:

It has been determined that you realized taxable income in 1953 in the amount of $47,050.32 from the cancellation by Laclede-Christy Company, St. Louis, of an indebtedness owing by Astell Refractories Company.

### OPINION.

The petitioner contends that the business conducted under the name of Astell Refractories Company was operated by him as a sole proprietorship and that he is entitled to deduct the full amount of losses sustained by that business in the years 1952 and 1953 in the respective amounts of $22,972.29 and $41,463.85, as claimed in his returns for those years. Alternatively, he contends that if there was a valid partnership it was created by the only agreement which was signed, namely, the document of February 1, 1952, and that under that document he would be entitled to deduct all losses. The respondent, in the notice of deficiency, took the position that this business was conducted by a partnership in which the petitioner participated in profits and losses to the extent of $33\frac{1}{3}$ percent, and therefore allowed the petitioner only one-third of these amounts as deductions. At the same time the respondent included in the petitioner's income the full amount of gain which he determined was derived in 1953 at the time of the transfer of the assets of the business to Laclede and the cancellation of indebtedness by Laclede, although on brief he now states that this was done for protective purposes only, and concedes that if he is sustained in his contention that the business should be treated as a partnership business then the petitioner is taxable upon only one-third of such amount of gain.

On brief the respondent, while not abandoning his contention that there was in fact an equal partnership, argues principally, upon the authority of *Maletis* v. *United States*, 200 F. 2d 97 (C.A. 9), certiorari denied 345 U.S. 924, affirming 97 F. Supp. 562, that since the petitioner held himself out generally to the public and third parties as a partner with his two children in the conduct of the business he may not now deny that there was a valid partnership and thereby obtain

the tax benefit of deducting the full amount of operating losses of the business.

However, we think that other facts present in the instant case render the doctrine of the *Maletis* case inapplicable. In the *Maletis* case the taxpayer purported to create a partnership in 1945 consisting of himself and his two sons, partnership returns were filed, and in his individual return for the year 1946 he gained a tax benefit by treating the business as a partnership. In 1948 he filed a claim for refund for the year 1945 on the ground that in 1947 he suffered a net operating loss which he was entitled to carry back and have deducted from his income of 1945. The taxpayer took the position that the partnership was invalid because the capital contribution on behalf of the sons was not in fact made and in any event was not made by the sons. The District Court held that there was a partnership and that the loss suffered in 1947 was not the taxpayer's own net operating loss, but was the loss of the partnership. The Court of Appeals held that whether what the taxpayer created could be considered a valid partnership for tax purposes was irrelevant; that he was bound by his election to do business as a partnership. However, as found by the court, the taxpayer there had represented to the United States Government that the business was conducted as a partnership for the purpose of obtaining Federal licenses to carry on its wine business, partnership tax returns had been filed, and the taxpayer had obtained a tax benefit in his own income tax return by treating the business as having been operated as a partnership.

In the instant case no partnership returns were filed, and the petitioner in his income tax returns for the 2 years covering the time he conducted the business did not represent that the business was conducted as a partnership. In his returns he represented the business as being owned by him solely and he also so represented in a protest filed with the respondent. Thus, irrespective of what position the petitioner might have taken had the operation of the business resulted in income instead of loss, the fact remains that he did not represent to the respondent, and thereby obtain a tax advantage, that the business was operated as a partnership.[1]

Accordingly, we hold that the petitioner is not precluded from raising the issue as to whether there was in fact a valid partnership consisting of himself and his two minor children, and we proceed to consider that question. In *Commissioner* v. *Culbertson*, 337 U.S. 733, the Supreme Court held that whether a purported family partnership is a valid partnership depends upon whether, considering all the facts, the parties in good faith and acting with a business purpose,

---

[1] Cf. also *Ferguson* v. *Commissioner*, 262 F. 2d 582 (C.A. 9), affirming a Memorandum Opinion of this Court; and *Sherman* v. *United States*, 141 F. Supp. 369 (E.D. Pa.).

intended to join together in the present conduct of the enterprise.[2] The Court recognized that the donee of an intrafamily gift may become a partner, but that it is important, in the determination of the intent of the parties, whether the donee, instead of the donor, exercises dominion and control over the subject of the gift or actively participates in the affairs of the business. The Court further pointed out that persons who contribute neither capital nor service cannot be included in the statutory description of "Individuals carrying on business in partnership" for to do so "would violate the first principle of income taxation: that income must be taxed to him who earns it," citing *Lucas* v. *Earl*, 281 U.S. 111.

After the decision in the *Culbertson* case, there remained considerable controversy in the field of family partnerships and Congress, by section 340 of the Revenue Act of 1951, amended the Internal Revenue Code of 1939, *inter alia*, to add to section 3797(a)(2) the following sentence:

A person shall be recognized as a partner for income tax purposes if he owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.

H. Rept. No. 586, 82d Cong., 1st Sess., 1951-2 C.B. 357, relating to section 340 of the Revenue Act of 1951[3] states that in the case of an

---

[2] The language used by the Court was in part as follows:

"* * * whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * *"

[3] Such report reads in part as follows:

"Section 312 of your committee's bill is intended to harmonize the rules governing interests in the so-called family partnership with those generally applicable to other forms of property or business. Two principles governing attribution of income have long been accepted as basic: (1) income from property is attributable to the owner of the property; (2) income from personal services is attributable to the person rendering the services. There is no reason for applying different principles to partnership income. If an individual makes a bona fide gift of real estate, or of a share of corporate stock, the rent or dividend income is taxable to the donee. Your committee's amendment makes it clear that, however the owner of a partnership interest may have acquired such interest, the income is taxable to the owner, if he is the real owner. If the ownership is real, it does not matter what motivated the transfer to him or whether the business benefited from the entrance of the new partner.

\* \* \* \* \* \*

"The amendment leaves the Commissioner and the courts free to inquire in any case whether the donee or purchaser actually owns the interest in the partnership which the transferor purports to have given or sold him. Cases will arise where the gift or sale is a mere sham. Other cases will arise where the transferor retains so many of the incidents of ownership that he will continue to be recognized as a substantial owner of the interest which he purports to have given away, as was held by the Supreme Court in an analogous trust situation involved in the case of *Helvering* v. *Clifford* (309 U.S. 351). The same standards apply in determining the bona fides of alleged family partnerships as in determining the bona fides of other transactions between family members. Transactions between persons in a close family group, whether or not involving partnership interests, afford much opportunity for deception and should be subject to close scrutiny. All the facts and circumstances at the time of the purported gift and during the periods preceding and following it may be taken into consideration in determining the bona fides or lack of bona fides of a purported gift or sale."

intrafamily gift the statutory amendments leave the Commissioner and the courts free to determine whether the donee actually owns an interest in the partnership or whether, on the other hand, the donor retains so many of the incidents of ownership that he will continue to be recognized as a substantial owner of the interest which he purports to have given away.

In the instant case it could not be effectively contended that there was a valid family partnership based upon services rendered by the petitioner's minor children to the business, which was that of purchasing, warehousing, and selling firebricks. At the time of commencement of the business the daughter was 9 years old and the son was 15. The record as a whole indicates that the petitioner was the one who conducted the affairs of the business and that the children did not render any services. If there was a partnership created, it would have to be based upon a conclusion that a part of the capital, $17,385.82, which was furnished by the petitioner, was furnished on behalf of the children and that this gave them a capital interest in the partnership.

The respondent, in support of the view that there was an equal partnership among the petitioner and his children, refers to the facts that: A partnership agreement to that effect was drafted; that trust instruments were drafted for the benefit of the children (under which the petitioner would transfer $2,500 to each trust as corpus) ; that the proposed partnership agreement called for the contribution to the partnership of $2,500 by the petitioner and each trust; that the petitioner did transfer to the business in January 1952, the approximate amount of $7,500; and that on January 15, 1952, there was executed a certificate of doing business as a partnership, which was recorded on February 11.

The fact is, however, that the then proposed partnership agreement was not signed and the trusts were never created. Accordingly, it is clear that no partnership was created by such proposed documents. The only document which was signed was that bearing date of February 1, 1952, which the petitioner signed for himself and which he signed for his two children "as guardian." That document purported to create a partnership under which gains would be shared equally by the petitioner and the children, but certain losses would be borne by the petitioner. The petitioner contends that, despite this document, no valid partnership was created since he furnished all the capital, he could not bind the minor children since he was not their legal guardian and the children lacked sufficient maturity and ex-

perience to conduct their affairs.[4] The respondent does not rely upon this document as evidencing the partnership which he determined existed. Rather, he states that either it was executed after the years in question or is not the agreement under which the business was operated. He points to the fact that it was not produced by the petitioner during the investigation, that it was not notarized, and that the petitioner's accountant, who prepared it, was not called to testify.

The petitioner testified that this document was signed at or about the time it purports to have been signed, and we cannot conclude that it was not. If there was a partnership created it would be by virtue of this document, which was the only one which was signed; but we think it clear that under its terms a valid partnership was not created. One of the provisions of that document is that upon termination of the purported partnership all property, after equal division of any profits earned up to that time, should go to the petitioner. Thus the petitioner retained the substantial incidents of ownership in the assets of the business. The petitioner did not carry out the original proposal of surrendering dominion and control by creating trusts for the benefit of the children; and it is also of some significance that neither he nor anyone else was ever appointed guardian for the children. Under these circumstances it seems clear that the petitioner's children did not acquire and own a capital interest in a partnership within the meaning of section 3797(a)(2), and that the parties did not in good faith and acting with a business purpose really intend to join together in the conduct of the business within the rule of the *Culbertson* case, and we so hold, and find as an ultimate fact. It is our conclusion that the petitioner was the sole proprietor of the business and that as such he is entitled to deduct the full amount of operating losses sustained in the business in the years 1952 and 1953 and is taxable upon the full amount of any gain derived when, in 1953, the business or the assets were transferred to Laclede and the indebtedness to Laclede was canceled. In so concluding we are not unmindful of the fact that the determination of the respondent that there was an equal partnership bears a presumption of correctness and that the burden of proof is upon the petitioner. However, the essential facts have been proven and such facts, in our opinion, compel the conclusion that no valid partnership existed; and it may be added that our conclusion would

---

[4] The petitioner contends, alternatively only, that if we hold that this document created a valid partnership, he is entitled, under its provisions, to deduct the net operating losses. In the view we take it is unnecessary to decide the alternative contention, but it may be stated that in any event there is considerable doubt that under this document the petitioner would be entitled to deduct the net losses in view of the provision therein that the petitioner and the children would each bear, pay, and discharge equally all rents and other expenses required for the support and management of the business.

be the same on these facts, whichever party might be claiming there was a valid partnership.

In 1953 the petitioner transferred all the assets of the business of Astell Refractories Company to Laclede and Laclede canceled all indebtedness owing to it and assumed the liabilities owing to others. The respondent in the notice of deficiency held that upon this transaction the petitioner realized ordinary income in the amount of $47,050.32 as a result of the cancellation of indebtedness by Laclede. It is his contention that of the value of assets, $98,785.24, listed on Astell's balance sheet, $3,890.11 was transferred in consideration of Laclede's assumption of liabilities to others, that the remaining value of assets, namely, $94,895.13 was payment, to that extent, of indebtedness owing to Laclede, and that the balance of the indebtedness, namely, $47,050.32 was canceled by Laclede, resulting in ordinary income from discharge of indebtedness.

The petitioner concedes on brief that there was a gain upon the transaction, but contends that the amount thereof was only $29,664.50 and that this was capital gain. It is his contention that the amount of indebtedness which was canceled in excess of the value of listed assets, namely, $47,050.32, was canceled in consideration of the transfer of the name and goodwill of Astell Refractories Company. He further contends that in computing the gain upon the sale there should be subtracted as basis the amount of $17,385.82, which he had advanced to Astell Refractories Company, resulting in gain of only $29,664.50.

It is well established that the transfer of assets in consideration of cancellation of indebtedness is equivalent to a sale upon which gain or loss is recognized in the amount of the difference between the basis of the assets transferred and the amount of the indebtedness which is canceled in consideration of the transfer.[5] Under some circumstances we have held that the full amount of indebtedness canceled is to be treated as the proceeds from a sale of the property, even though the value of the assets is less than the amount of the indebtedness canceled. *Peninsula Properties Co.*, 47 B.T.A. 84, and *Unique Art Manufacturing Co.*, 8 T.C. 1341. But this would seem to be largely a factual question as to how much of the indebtedness was intended by the parties to be canceled as a result of the transfer of assets. Thus, in *Estate of W. R. Whitthorne*, 44 B.T.A. 1234, affirmed per curiam 148 F. 2d 825 (C.A. 9), we held that the amount of the taxpayer's indebtedness canceled, which was in excess of the amount of cash and the value of property transferred by the debtor, was ordinary income from cancellation of indebtedness.

---

[5] See *Suisman* v. *Eaton*, 15 F. Supp. 113, affirmed per curiam 83 F. 2d 1019 (C.A. 2), certiorari denied 299 U.S. 573, *William R. Kenan*, 40 B.T.A. 824, affd. 114 F. 2d 217 (C.A. 2), and *Rogers* v. *Commissioner*, 103 F. 2d 790 (C.A. 9), affirming 37 B.T.A. 897.

As stated, in the instant case the petitioner does not contend that the full amount of indebtedness was canceled as a result of the transfer of the assets of a value of $94,895.13; rather, he contends that to the extent of $47,050.32 the indebtedness was canceled in consideration of the transfer of goodwill and business name of Astell. In support of his contention he points out that Laclede continued to operate the business and hired the petitioner. While it is true that the contract of December 15, 1953, recited that there was transferred to Laclede all property used in the business of Astell, including the name "Astell Refractories" as well as all contracts, books of account, and papers and documents relating to the business, no mention is made therein specifically of goodwill, and the balance sheet attached to the contract does not list any item of value for either goodwill or the business name. The contract itself, at the outset, recognizes that the liabilities of Astell exceed its assets. Actually the business had been unsuccessful, having had net losses for each of the 2 years it was conducted by the petitioner. And it may be added (without expressing any opinion as to the tax consequences of the transaction to Laclede) that Laclede evidently did not consider that the full amount of the indebtedness canceled was in payment for assets received, since it charged to its reserve for bad debts an amount of $46,851.93, being the approximate amount of the difference between the indebtedness to it and the listed value of the assets it received.

Upon a consideration of the whole record, it is our conclusion that the petitioner has not adduced proof to show that the business name had value or that there was any goodwill to which value attached, or if there was any such value, the amount thereof. Accordingly, he has not shown that the excess of the indebtedness canceled over the value of assets transferred, namely, $47,050.32, constituted payment for the transfer of any assets.

The record indicates that the petitioner was personally liable for the indebtedness—at least there is no evidence that he was not. Furthermore, there is no evidence that the petitioner was insolvent, and therefore no basis for concluding that the cancellation of the indebtedness did not have the effect of freeing assets of the petitioner to the extent of $47,050.32 as a result of the indebtedness being canceled. Furthermore, there is no indication whatever that there was any intention on the part of Laclede to make a gift to the petitioner or that the cancellation to the extent of $47,050.32 constituted a release for nothing; rather, the record as a whole, including the petitioner's testimony,[6] indicates that Laclede was trying to make the best deal

---

[6] Petitioner's testimony was in part as follows:

"Q. After this agreement with Laclede in 1953, all the liability of the Astell Refractory Company was cancelled; is that right?

A. I would say that it was cancelled for my subsequent performances for them.

Q. You weren't personally liable any more after that agreement?

A. That is correct only morally to help support their sales in the New York Territory."

possible. Under these circumstances we must conclude that the petitioner, as a result of the transaction, was in receipt of ordinary income in the amount of $47,050.32 from discharge or forgiveness of indebtedness. See *United States* v. *Kirby Lumber Co.*, 284 U.S. 1; *Commissioner* v. *Jacobson*, 336 U.S. 28; *Capitol Coal Corporation*, 26 T.C. 1183, affd. 250 F. 2d 361 (C.A. 2), certiorari denied 356 U.S. 936; and *Estate of W. R. Whitthorne, supra.*

It may be added that even if it were considered that the total amount of the indebtedness was canceled in consideration of the transfer of assets and that any gain derived was gain from the sale thereof, the conclusion would have to be the same, namely, that substantially all of the gain was ordinary income. It is well established that "upon the sale of a going business it [the sales price] is to be comminuted into its fragments, and these are to be separately matched against the definition in section 117(a)(1) * * *." *Williams* v. *McGowan*, 152 F. 2d 570 (C.A. 2). Since the petitioner has not shown the existence of any value of goodwill or business name, no portion of the indebtedness canceled could be allocated thereto. The full amount of the indebtedness canceled would be allocated among the assets listed on the balance sheet. These assets, to the extent of $90,962.71, consisted of inventory and accounts receivable, which clearly do not constitute capital assets within the definition of section 117 of the Internal Revenue Code of 1939. Any gain upon the sale thereof would constitute ordinary income. And it may be added that any such gain would be the difference between the basis of the assets and the amount considered as the selling price thereof. Any such gain would not be offset by the amount of $17,385.82, which the petitioner had advanced to or invested in the business.

We sustain the respondent's determination that the petitioner is taxable upon the amount of $47,050.32 as ordinary income in the year 1953.

The petitioner also raised the issue of the disallowance by the respondent of medical expenses claimed. The respondent does not question that such expenditures were made and that they are deductible to the extent provided in the statute. The amount deductible will be computed, in the light of our conclusions herein, in the recomputation under Rule 50.

*Decision will be entered under Rule 50.*