ESTATE OF PETER FINDER, DECEASED, NATHAN FINDER, COEXECUTOR, AND FRIEDA FINDER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

NATHAN FINDER AND LILLIAN FINDER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 74592, 74593.   Filed December 4, 1961.

*Jackson L. Boughner, Esq.*, for the petitioners.
*Arthur N. Nasser, Esq.*, for the respondent.

ATKINS, *Judge:* Respondent determined deficiencies in income tax of petitioners in Docket Nos. 74592 and 74593 in the respective amounts of $651.70 and $3,037.92 for the taxable year 1954.   The issues are: (1) Whether gain upon the sale of real estate lots constituted long-term capital gain, as contended by the petitioners, or ordinary income from sale of property held primarily for sale to customers in the ordinary course of trade or business, as determined by the respondent, and (2) whether the respondent properly disallowed a portion of depreciation claimed upon a hotel property.

### FINDINGS OF FACT.

Some of the facts have been stipulated and are incorporated herein by this reference.

Peter Finder and his brother Nathan Finder, together with their respective spouses, Frieda and Lillian, filed joint Federal income tax returns for the taxable year 1954 with the district director of internal revenue, Chicago, Illinois.   Peter Finder died on February 3, 1957.

In 1926 Nathan and Peter acquired for investment purposes, at a cost of $22,500, 20 acres of land in Oak Lawn, Illinois, which is located in the Chicago metropolitan area.   Over a period of years thereafter they made no attempts to sell the land, but at some time not

disclosed by the record they determined to sell it. In 1947 a number of persons made offers ranging up to $10,000 for the land. No buyer was found who was willing to pay a reasonable price for the tract.

The affairs of Nathan and Peter were being handled by Nathan's son, Paul Finder, and his nephew, Harvey Amsterdam, who had complete authority to dispose of the property or to use it in any fashion that they saw fit. In the late summer of 1952 Nathan and Peter, together with Paul Finder and Harvey Amsterdam, met with A. Jerome Moos, an attorney who had represented builders. Moos discussed with them the details of the operation of building homes and various methods that were used by his clients. Paul Finder and Harvey Amsterdam decided that it was advisable to subdivide the land. Accordingly, in September 1952, Nathan and Peter subdivided the 20 acres into 64 lots and entered into a partnership, known as Lorel Homes, which had as its purpose the construction and sale of homes thereon.

On October 8, 1952, Nathan and Peter recorded the subdivision as "Lorel Homes" in the office of the recorder of deeds of Cook County, Illinois. Subsequently a portion of the property was improved with a gravel road. This and other subdivision costs amounted to $5,084.45. A contracting firm was engaged, construction of 5 homes was begun on lots numbered 1, 2, 3, 4, and 32, and a realty firm was given the exclusive agency to sell the homes.

Nathan had been in the candy-manufacturing business. He did not have a real estate dealer's license and had never engaged in any form of the real estate business.

On December 22, 1952, and March 3, 1953, the first and second sales were made, being lots 2 and 32, respectively, on which homes had been built. Homes on lots 1, 3, and 4 were completed or substantially completed by approximately March 1953. Thereafter Nathan and Peter, doing business as Lorel Homes, discontinued the construction of homes.

Since the realty firm had not been successful in disposing of the homes, further conferences were had by Nathan and Peter and their managers with Moos about February or March 1953, at which there was discussed the feasibility of Moos' taking over the operation or the possibility of creating a corporation to take over the further development and sale of homes in the area. As a result, a corporation known as Reliabilt Homes, Inc., was formed on May 11, 1953, by Paul Finder, Amsterdam, and Moos. On the same date an option agreement was executed between Reliabilt Homes, Inc., and Nathan and Peter Finder and their wives.

The agreement granted an option to Reliabilt Homes, Inc., to purchase, as required by it and upon its demand, any or all of the 62 lots then remaining unsold (lots 2 and 32 having already been improved by construction of homes and sold). The option price of 40 of the lots was $1,300 each and of 18 of the lots was $1,452 each. The option price of lot 1 (which was improved with a home) was $10,800, and the price of lots 3, 4, and 31, which also contained improvements, was $1,452 each plus the actual cost of the improvements. It was provided that as the transfer of each lot was demanded, the sellers would deliver a warranty deed thereto. It was also provided that the option should continue to December 31, 1953, at which time it should automatically expire unless prior to that time the buyer had exercised the option and paid for not less than 25 lots, in which case the option was to be extended automatically to December 31, 1954.

Within a week after the incorporation of Reliabilt, Moos arranged financing of his own. Thereupon Paul and Amsterdam withdrew from the corporation, leaving Moos as the sole shareholder.

During the year 1953, 16 lots of the Lorel Homes subdivision, none of which was improved with a residence, and lot #1 which was improved with a residence, were sold by Nathan and Peter to Reliabilt pursuant to the option agreement. The sale of lot #1 together with the residence thereon and other improvements thereto resulted in a loss of $443.32.

Toward the end of the year 1953, it appeared that Reliabilt might not sell within that year enough lots to cause an automatic extension of the option agreement, but Nathan and Peter entered into an agreement with Reliabilt on December 9, 1953, whereby it was agreed that if Reliabilt should, by January 5, 1954, purchase 10 lots, specified by number, the option would be automatically extended to December 31, 1954. The option agreement was duly extended automatically to December 31, 1954.

During the year 1954 eight more lots of the Lorel Homes subdivision, none of which had been improved with a residence, were sold by Nathan and Peter to Reliabilt pursuant to the option agreement.

Reliabilt, which had been exercising its option as it found purchasers for particular lots, had been unable to sell lots 3 and 4, the remaining lots which had been improved with residences. On August 2, 1954, it surrendered its option right to those two lots. Subsequently, on August 6, 1954, and September 3, 1954, lots 3 and 4, respectively, were sold by Nathan and Peter through the facilities of the realty company which they had originally engaged, accepting mortgages in order to make the sales. Each lot was sold at a loss.

The following is a summary of the lots, unimproved by residences, sold by Nathan and Peter to Reliabilt:

| Date of sale | Lot Nos. | Date of sale | Lot Nos. |
|---|---|---|---|
| June 18, 1953 | 5<br>30<br>40 | Nov. 2, 1953 | 10 |
|  |  | Nov. 6, 1953 | 7 |
| July 16, 1953 | 29<br>34 | Dec. 19, 1953 | 41 |
|  |  | Dec. 15, 1953 | 39 |
| Aug. 7, 1953 | 6<br>35 |  | 9 |
| Aug. 20, 1953 | 25 | Jan. 4, 1954 | 26<br>27<br>28<br>38<br>42 |
| Sept. 17, 1953 | 8<br>37 |  | 43 |
| Oct. 16, 1953 | 31<br>36 | July 19, 1954 | 24 |

Upon the request of Nathan and Peter, Moos agreed to a termination of the option and on December 10, 1954, it was terminated by the parties and Reliabilt executed a quitclaim deed to the remaining 34 lots.[1] In 1956 all the remaining lots were sold in one unit to one purchaser.

The sales of lots which were unimproved by houses resulted in the realization of gains of $15,162.87 in 1953 and $11,125.96 in 1954. Such sales in 1953 and 1954 were not reported in any returns filed by the partnership Lorel Homes. On their respective income tax returns for 1954 Nathan and Peter each reported one-half of the gain of $11,125.96 as long-term capital gain, and each took one-half of his share as a deduction pursuant to section 1202 of the Internal Revenue Code of 1954. The respondent determined that the lots sold in 1954 were not capital assets but were property held primarily for sale to customers in the ordinary course of business, and that the gain of $11,125.96 constituted ordinary income under section 61 of the Internal Revenue Code of 1954. He therefore disallowed the 50-percent deduction claimed for capital gains.

The Lorel Homes partnership return for the fiscal years ended August 31, 1953, 1954, and 1955, reported ordinary net losses from the sales of lots improved with homes in the respective amounts of $2,665.18, $443.32, and $1,740.05. In their income tax returns for the year 1954 Nathan and Peter each reported as his share of ordinary net loss from the Lorel Homes partnership operation for the fiscal year ended August 31, 1954, the amount of $221.66. No adjustment was made by the respondent with respect to this loss.

The lots sold in 1954 constituted property held by Nathan and Peter, or their partnership, primarily for sale to customers in the ordinary course of trade or business.

*Hotel Maryland Partnership—Depreciation.*

On March 1, 1952, Nathan and Peter acquired property known as the Hotel Maryland from the 900 North Rush Street Corporation

---

[1] This is stipulated, but other stipulated facts indicate that there were 35 lots remaining at that time. The discrepancy is not explained.

and on or about that date they formed a partnership, known as the Hotel Maryland, to operate the hotel. A partnership income tax return was filed for the partnership for the fiscal year ended February 28, 1954. The partnership employed the accrual method of accounting in reporting income.

On March 2, 1952, the books of the partnership reflected the following information relating to the basis of the property:

| | |
|---|---:|
| Assumed mortgage | $602,494.95 |
| Cost of stock, 8,600 shares at $57.21 | 492,006.00 |
| Legal fees | 16,680.30 |
| Total purchase price | 1,111,181.25 |

The partnership's accountant allocated the purchase price among the assets received and entered the amounts on the books of the partnership. Paul Finder who, with Amsterdam, was in charge of the operations of the hotel, and who had offices therein, approved the allocation. The allocation was made among the various items in proportion to the adjusted bases thereof as carried on the books of the seller (except that there was allocated as purchase price of the land the amount at which it was carried on the books of the seller) as follows:

| Item | Adjusted bases per books of seller | Allocation of purchase price by partnership |
|---|---:|---:|
| Land | $60,825.00 | $60,825.00 |
| Building | 218,537.07 | 583,052.75 |
| Carpeting | 12,477.31 | 33,296.03 |
| Furniture | 9,928.58 | 26,468.98 |
| Alterations | 149,646.95 | 399,240.41 |
| Curtains, drapes | 1,868.44 | 4,936.67 |
| Boiler | 1,275.00 | 3,361.14 |
| | 454,558.35 | 1,111,181.25 |

The alterations referred to in the above tabulation consisted of work performed in the building in the years as follows:

| Alterations | Cost | Date |
|---|---:|---|
| Dining room | $99,991.87 | 1949 |
| Lobby | 42,803.71 | 1950–1951 |
| Dining room | 5,376.37 | 9/30/51 |
| Mezzanine | 5,639.12 | 1948 |
| Miscellaneous | 3,340.11 | 1949 |
| Drug store | 9,366.36 | 1949 |
| Total (before depreciation) | 166,517.54 | |

No additions were made to the building. In 1954 the remaining useful lives of the building and the alterations were 24 years and 14 years, respectively.

In their income tax returns for the taxable year 1954 Nathan and Peter each claimed as a deduction an amount of $14,234.75 represent-

ing his share of the loss reported by the Hotel Maryland partnership in its return for the fiscal year ended February 28, 1954. The respondent determined that the partnership's loss for that year was $15,201.34 and that the distributable share of each was $7,600.67, thereby increasing the reported income of each of the individuals by the amount of $6,634.08. In redetermining the reported partnership loss, the respondent disallowed real estate taxes claimed in the amount of $10,490.39 and disallowed $2,777.76 of the amount of depreciation claimed on account of the Hotel Maryland. In the notice of deficiency the respondent, in regard to the disallowance of a portion of the depreciation claimed by the partnership, stated:

Depreciation on buildings and improvements, deducted on the return in the amount of $49,938.12 has been disallowed in the amount of $2,777.76 under section 167 of the Internal Revenue Code of 1954 as computed below.

| | Cost | Depreciation Allowed or Allowable | Adjusted Basis Col. 2 Less Col. 3 | Remaining Life | Allowable Depreciation |
|---|---|---|---|---|---|
| Building | $583,052.75 | $23,322.12 | $559,730.63 | 24 yrs. | $23,322.12 |
| Building Addition | 100,000.00 | 6,666.67 | 93,333.33 | 24 yrs. | 3,888.88 |
| Improvements | 299,240.41 | 19,949.33 | 279,291.08 | 14 yrs. | 19,949.36 |
| Total allowable depreciation | | | | | $47,160.36 |
| Depreciation deducted on return | | | | | 49,938.12 |
| Depreciation disallowed | | | | | $2,777.76 |

The remaining useful lives of the building and the alterations determined by the respondent are the same as claimed in the partnership return.

An internal revenue agent examined the books and returns of the Hotel Maryland partnership for the fiscal year ended February 28, 1954, and filed a report with respect thereto. Of the amount of $399,240.41 claimed by the partnership as cost of alterations, the agent in his report allocated $299,240.41 to "improvements" and $100,000 to the building itself, increasing the cost of the building to $683,052.75. The adjustment made in his report was as follows:

| | Cost | Less Depreciation Allowed | Adjusted Basis | Remaining Life | Depreciation This Year |
|---|---|---|---|---|---|
| Building | $583,052.75 | $23,322.12 | $559,730.63 | 24 yrs. | $23,322.12 |
| Add | 100,000.00 | 6,666.67 | 93,333.33 | 24 yrs. | 3,888.88 |
| Total | $683,052.75 | $29,988.79 | $653,063.96 | | $27,211.00 |
| Improvements | 299,240.41 | 19,949.33 | 279,291.08 | 14 yrs. | 19,949.36 |
| Corrected depreciation allowable | | | | | $47,160.36 |
| Depreciation claimed per return | | | | | 49,938.12 |
| Net increase in income | | | | | $2,777.76 |

The notice of deficiency was based upon the revenue agent's report.

Each petition assigns as error the respondent's determination that the distributable share of the Hotel Maryland partnership net loss was overstated in the amount of $6,634.08. By stipulation, however,

the petitioners concede that the respondent correctly determined the partnership net loss except to the extent that he disallowed depreciation. With respect to the depreciation issue each petition contains in paragraph 5(b) the following statement of facts:

The only adjustment proposed in the notice of deficiency is to set up a new category of "Building Additions" of $100,000, reducing building improvements by the same amount. The allocation of the purchase price by the petitioners was in accordance with the relative values of the component elements of the property and no readjustment is necessary. The depreciation claimed on the partnership return was reasonable in amount.

In his answers the respondent denied the petitioners' assignments of error. With respect to the statements of fact in paragraph 5(b) of the petitions, the respondent in his answers stated:

Admits that Nathan and Peter Finder purchased the property known as the Maryland Hotel, located at 900 North Rush Street, Chicago, Illinois allocating $583,052.75 to the building and $399,240.41 to the building improvements and that the notice of deficiency reallocated $100,000.00 claimed as building improvements to the cost of additions to the building, reducing building improvements by the same amount. Denies the remaining allegations of paragraph 5.(b) of the petition.

### OPINION.

It is contended by the petitioners that the gain of $11,125.96 realized by Nathan and Peter Finder in the taxable year 1954 from the sale of eight lots constituted long-term capital gain, whereas the respondent in the notice of deficiency determined that the gain constituted ordinary income from the sale of property held primarily for sale to customers in the ordinary course of a trade or business.[2]

Although there have been many cases involving this issue under varying factual situations, in the final analysis the decision must rest upon a consideration of all facts present in the particular case. Many factors have been considered by the courts as aids in determining the question, although no one factor is necessarily decisive. Among the criteria used are the nature of the acquisition of the property, that is, whether for sale or investment; the frequency and continuity of transactions over a period of time as distinguished from casual or isolated transactions; substantiality of transactions; and the activity of the seller with respect to the property, such as the extent of his improvements or his activity in promoting sales. See *Frankenstein* v. *Commissioner*, (C.A. 7) 272 F. 2d 135, certiorari denied 362 U.S. 918, affirming 31 T.C. 431; *Pool* v. *Commissioner*, (C.A. 9) 251 F. 2d 233, certiorari denied 356 U.S. 938, affirming a Memorandum Opinion of this Court; *C. E. Mauldin*, 16 T.C. 698, affd. (C.A. 10) 195 F. 2d 714;

[2] Section 1221 of the Internal Revenue Code of 1954 provides that the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

and *Joseph M. Philbin*, 26 T.C. 1159. It has been held, however, that while the purpose for which the property was acquired is of some weight, the ultimate question is the purpose for which the property was held at the time of sale. *Bauschard* v. *Commissioner*, (C.A. 6) 279 F. 2d 115, affirming 31 T.C. 910; *Rollingwood Corporation* v. *Commissioner*, (C.A. 9) 190 F. 2d 263, affirming a Memorandum Opinion of this Court; *C. E. Mauldin*, *supra;* and *Joseph A. Harrah*, 30 T.C. 1236.

The word "primarily" as used in the statutory provision that the property be held primarily for sale to customers has been construed as meaning "substantial" or "essential" rather than as "principal" or "chief." *Rollingwood Corporation* v. *Commissioner, supra; Real Estate Corporation*, 35 T.C. 610; *Joseph A. Harrah, supra; American Can Co.*, 37 T.C. 198; and *S.E.C. Corporation* v. *United States*, (S.D.N.Y.) 140 F. Supp. 717, affd. (C.A. 2) 241 F. 2d 416, certiorari denied 354 U.S. 909. Property may be held for a dual purpose. If one of such purposes is to sell to customers in the ordinary course of business, the sales may fail to qualify for capital gains treatment. *Bauschard* v. *Commissioner, supra; Rollingwood Corporation* v. *Commissioner, supra;* and *S.E.C. Corporation* v. *United States, supra.* Inasmuch as the capital gains provisions constitute an exception to the normal tax requirements of the Code, they are to be narrowly construed. *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260, and *Corn Products Refining Co.* v. *Commissioner*, 350 U.S. 46.

Here the 20-acre tract of land was purchased in 1926 for investment purposes at a cost of $22,500 and unsuccessful attempts were later made to liquidate the investment. Finally in September 1952 Nathan and Peter subdivided the tract into 64 lots, named and recorded the subdivision as Lorel Homes, and entered into a partnership also known as Lorel Homes. An amount of $5,084.45 was expended for a gravel road and other unidentified subdivision costs, a contracting firm was engaged to construct five homes, and a realty firm was engaged to sell them. The management of this project was in the hands of Nathan's son, Paul Finder, and his nephew, Harvey Amsterdam. Difficulty was experienced in disposing of the five homes which were constructed and the individuals constructed no further homes. Instead, they discussed with A. Jerome Moos the advisability of creating a corporation to take over the further development and sale of homes in the area. The corporation, Reliabilt, was formed in May 1953, the ultimate owner being Moos, and the individuals granted an option to Reliabilt to purchase any or all of the lots from time to time over the period of the option.

In December 1952, the partnership sold one lot which had been improved by a residence and in March 1953 it sold another. In 1953 16 lots, not improved with residences, were sold at various dates pur-

suant to the option agreement. One lot which had been improved with a residence was also sold to Reliabilt. During the year 1954, the year in question, eight lots unimproved by residences were sold to Reliabilt pursuant to the option agreement, seven of them being sold on January 4, 1954, and one being sold on July 19, 1954. In August and September 1954, two lots improved with residences, which had been released from the option, were sold by Nathan and Peter. The option was terminated in December 1954, and no further lots were sold until 1956 when all the remaining lots were sold in one unit to one purchaser.

The petitioners raise no question that to the extent of the building and the sale of homes on five lots the activities constituted the carrying on of business through the partnership; indeed, the partnership claimed ordinary losses on those transactions and the individuals carried over such losses to their individual income tax returns. Petitioners contend, however, that this was the extent to which a trade or business was conducted. Paul Finder, one of the managers of the operation, testified that the intention was to dispose of the land, that houses were built with a view to attracting a buyer for such tract, and that there was no intention to build more than five houses. The stipulation entered into between the parties states that Nathan and Peter subdivided the 20-acre tract into 64 lots and entered into a partnership which had as its purpose the construction and sale of homes thereon. The evidence discloses that the formation of the partnership followed discussions had with Moos with respect to the details of the operation of building homes. It may well be that the intention was to dispose of the tract as a whole or to continue to build and sell homes, whichever might appear most advantageous. In any event, it seems to us that, the land having been subdivided and five houses having been built for sale, all the lots must be considered as being an inherent part of the enterprise. It is clear that the remaining lots were held for sale, whether improved or not. Indeed, 24 of such lots were sold, 8 of them being sold in the year in question. Also in 1954 the individuals, or their partnership, sold two lots improved with residences. We think the sales must be considered as frequent and continuous as distinguished from casual or isolated.

The petitioners, in arguing that there were few and infrequent sales, stress the fact that in 1954 the only sales made, other than those made under the option to Reliabilt, were the sales of two lots improved with residences. The respondent contends that Reliabilt was either an agent of the individuals or was a joint venturer with them in the sale of lots. We find it unnecessary to consider whether Reliabilt was an agent or a joint venturer, since in any event we think it must be considered that the individuals held their lots for sale to customers in a trade or business. The subject of the purchase option given by the

individuals to Reliabilt was *lots*, and not a tract, and the optionee must, we think, be considered as a customer for lots.

The petitioners also state on brief that there was no advertisement of properties for sale. There is no evidence whatever with respect to advertising or other promotional activities. In any event that factor alone would not necessarily indicate that the lots were not held for sale to customers in the ordinary course of a trade or business; nor would the fact that Nathan and Peter did not personally engage in any activities with respect to the subdivision and sale of lots, but left the management to Paul Finder and Harvey Amsterdam. It is well settled that a business may be conducted through agents. *Walter H. Kaltreider*, 28 T.C. 121, affd. (C.A. 3) 255 F. 2d 833; *Achong* v. *Commissioner*, (C.A. 9) 246 F. 2d 445, affirming a Memorandum Opinion of this Court; and *Bauschard* v. *Commissioner, supra.*

It is our conclusion that the activities here in question constituted the carrying on of a trade or business, and that the lots were held primarily for sale to customers in the ordinary course of such trade or business within the meaning of the statute, as interpreted by the cases hereinabove cited.

The petitioners also rely upon section 1237 of the Internal Revenue Code of 1954. Pertinent provisions of that section, as they apply to the taxable year 1954, are set forth in the margin.[3]

It is to be noted that section 1237 is not applicable if any substantial

---

[3] Sec. 1237(a). GENERAL.—Any lot or parcel which is part of a tract of real property in the hands of a taxpayer other than a corporation shall not be deemed to be held primarily for sale to customers in the ordinary course of trade or business at the time of sale solely because of the taxpayer having subdivided such tract for purposes of sale or because of any activity incident to such subdivision or sale, if—

(1) such tract, or any lot or parcel thereof, had not previously been held by such taxpayer primarily for sale to customers in the ordinary course of trade or business (unless such tract at such previous time would have been covered by this section) and, in the same taxable year in which the sale occurs, such taxpayer does not so hold any other real property; and

(2) no substantial improvement that substantially enhances the value of the lot or parcel sold is made by the taxpayer on such tract while held by the taxpayer or is made pursuant to a contract of sale entered into between the taxpayer and the buyer. For purposes of this paragraph, an improvement shall be deemed to be made by the taxpayer if such improvement was made by—

(A) the taxpayer or members of his family (as defined in section 267(c)(4)), by a corporation controlled by the taxpayer, or by a partnership which included the taxpayer as a partner; * * *

    *      *      *      *      *      *      *

* * * and

(3) such lot or parcel, except in the case of real property acquired by inheritance or devise, is held by the taxpayer for a period of 5 years.

(b) SPECIAL RULES FOR APPLICATION OF SECTION.—

  *      *      *      *      *      *      *

(3) NECESSARY IMPROVEMENTS.—No improvement shall be deemed a substantial improvement for purposes of subsection (a) if the lot or parcel is held by the taxpayer for a period of 10 years and if—

(A) such improvement is the building or installation of water or sewer facilities or roads (if such improvement would except for this paragraph constitute a substantial improvement);

(B) it is shown to the satisfaction of the Secretary or his delegate that the lot or parcel, the value of which was substantially enhanced by such improvement,

improvement (except the building or installation of water or sewer facilities or roads) which substantially enhances the value of the lot or parcel sold is made by the taxpayer on the tract of land, and that the statute specifically provides that an improvement made by a partnership which included the taxpayer as a partner is to be deemed to have been made by the taxpayer. Here residences were constructed by the partnership on five of the lots comprising the tract. As late as 1947 the individuals were offered no more than $10,000 for the entire tract, whereas individual lots were sold in 1953 and 1954 for $1,300 and $1,452. We think there can be no question that the five residences constituted substantial improvements,[4] and it seems reasonable to conclude that they substantially enhanced the value of the lots. See *Hvidsten* v. *United States*, (D. N. Dak.) 185 F. Supp. 856. In any event, the petitioners, upon whom rested the burden of proof, have not shown that these improvements did not substantially enhance the value of the remaining lots. *Kelley* v. *Commissioner*, (C.A. 9) 281 F. 2d 527.

Section 1237(a)(1) also provides that as a prerequisite to the application of the section, the tract, or any lot or parcel thereof, shall not have been previously held by the taxpayer primarily for sale to customers in the ordinary course of trade or business. It also provides that in the same taxable year in which the sale in question occurs, the taxpayer shall not hold any other real property primarily for sale to customers in the ordinary course of trade or business. The petitioners do not question that to the extent of the five lots which were improved by residences in 1952 and 1953 they or their partnership were engaged in the conduct of a trade or business and held such lots for sale to customers. In 1954 either they or the partnership continued to hold two of such improved lots and both lots were sold in that year. Whether the lots were held and sold by them individually or by the partnership is, we think, immaterial. We think section 1.1237–1(b)(3) of the Income Tax Regulations correctly provides that "The taxpayer is considered as holding property which he owns individually, jointly, or as a member of a partnership." For these additional reasons we think section 1237 is not here applicable.

In view of the foregoing, we hold that the respondent did not err in determining that the gain upon the sale of the lots in 1954 constituted ordinary income.

would not have been marketable at the prevailing local price for similar building sites without such improvement; and

(C) the taxpayer elects, in accordance with regulations prescribed by the Secretary or his delegate, to make no adjustment to basis of the lot or parcel, or of any other property owned by the taxpayer, on account of the expenditures for such improvements. Such election shall not make any item deductible which would not otherwise be deductible.

(c) TRACT DEFINED.—For purposes of this section, the term "tract of real property" means a single piece of real property, except * * * [exceptions not applicable].

[4] Section 1.1237–1(c)(4) of the Income Tax Regulations provides that residential buildings are to be considered substantial improvements.

The second issue relates to the respondent's action in reducing the depreciation allowance to which the Hotel Maryland partnership was entitled, and thereby reducing the net loss shown by the partnership and the amount thereof deductible by Peter and Nathan in their individual returns for the taxable year 1954.

The partnership had purchased the hotel property about March 1, 1952, for $1,111,181.25 and had allocated the purchase price among the assets received in proportion to the adjusted bases of the various assets as shown on the books of the seller (with the exception of land, as pointed out in the Findings of Fact). The petitioners point out that in the notice of deficiency the respondent did not disturb the partnership's allocation insofar as $583,052.75 was allocated as cost of the building itself, but that with respect to the amount of $399,240.41 which the partnership had allocated to "alterations," he set up two accounts, one being "improvements" of $299,240.41, and another being "building addition" of $100,000. The effect of this was to reduce the depreciation allowable, since the respondent held that the $100,000 allocated to "building addition" was to be depreciated over a remaining useful life of 24 years, whereas "alterations" or "improvements" were held to be depreciable over a remaining useful life of 14 years.

It is the contention of the petitioners that since in his answer the respondent admitted that the notice of deficiency reallocated $100,000 to "cost of additions to the building," the issue presented by the notice of deficiency and the pleadings is one of fact, namely, whether there had been any addition to the building to which $100,000 of the purchase price should be allocated; that since the evidence presented shows that there had been no addition to the building they have met their burden of proof; that if the respondent desired to show that $100,000 should be reallocated from "alterations" to the building itself, which had a remaining useful life of 24 years, it was incumbent upon him to affirmatively plead and assume the burden of proving his position; and that since he has not done so, the partnership's allocation of $399,240.41 to alterations having a remaining useful life of 14 years should be approved.

The respondent's position, stated at the hearing and on brief, is to the effect that the petitioners misconstrue the notice of deficiency; that there was no addition to the building and that respondent does not so claim; that properly construed the notice of deficiency reallocates $100,000 from alterations to the building; and that the burden of proof remained upon the petitioners to show that they are entitled to the amount of depreciation claimed. In support of his claim as to the proper interpretation of the notice of deficiency, the respondent introduced the testimony and report of the revenue agent who made the examination, which clearly shows that the adjustment proposed by

such agent was to allocate to the building itself $100,000 of the amount which the partnership had allocated to alterations.

While we are satisfied that, as stated by the revenue agent, the notice of deficiency was based upon his report, the fact remains that literally the notice of deficiency did allocate $100,000 which had been claimed as cost of alterations to a category of "building addition," as admitted by the respondent in his answer, while leaving the allocation of $583,052.75 as cost of the building undisturbed. But we think it immaterial whether the notice of deficiency be read literally or construed as the respondent urges. In either event we do not think the pleadings narrow the issue, as contended by the petitioners, to the mere factual question of whether there was an addition to the building to which $100,000 of the purchase price might be allocated. As we view the matter, the effect of the respondent's notice of deficiency was to hold that the partnership was not entitled to an allowance for depreciation on alterations, having a remaining useful life of 14 years, based on a greater cost than $299,240.41, and that the issue posed by the pleadings is whether the partnership is entitled to the greater basis for "alterations" and hence the greater depreciation allowance claimed. We note that the respondent in his answers denied the broad allegations of error and also denied the allegations in the petitions that the allocation of the purchase price by the petitioners was in accordance with the relative values of the component elements of the property, that no readjustment is necessary, and that the depreciation claimed on the partnership return was reasonable in amount.

The fact that the respondent may have assigned an incorrect reason for reducing the basis for depreciation of "alterations" or "improvements," does not, in our opinion, relieve the petitioners of the burden of proving that the partnership's allocation of $399,240.41 to such alterations was proper. The reasons given in the notice of deficiency do not constitute the issues and the presumption of correctness of the respondent's determination is not destroyed by the reason given, even if it be unsound or badly expressed. See *Edgar M. Carnrick*, 21 B.T.A. 12, and *James B. Gossett*, 22 B.T.A. 1279, affirmed on other issues 59 F. 2d 365. It is well established that the respondent's determination has the support of a presumption of correctness, and that the burden of proof to establish a deductible loss, and the amount of it, rests upon the taxpayer. *Burnet* v. *Houston*, 283 U.S. 223, *Welch* v. *Helvering*, 290 U.S. 111, and *New Colonial Co.* v. *Helvering*, 292 U.S. 435.[5]

---

[5] See also *Helvering* v. *Taylor*, 293 U.S. 507, wherein the Supreme Court, citing among other cases, *Burnet* v. *Houston*, 283 U.S. 223, expressed the view that where a deduction is involved the burden is upon the taxpayer to not only show error on the part of the respondent, but also to prove the amount of the deduction claimed, in order to establish a basis for a decision in his favor.

Where consideration is paid for a mixed aggregate of assets, it is to be allocated among the several properties in accordance with their relative values. *C. D. Johnson Lumber Corporation*, 12 T.C. 348, and *Harry L. Bialock*, 35 T.C. 649. In support of the allocation of the purchase price by the partnership among the various items purchased, the petitioners introduced the testimony of Paul Finder who was one of the managers of the hotel property after it was acquired by Peter and Nathan Finder. He testified that at the time the allocation was made by the accountant for the partnership it was submitted to him, that he believed it to be proper, and that he approved it. He testified in effect that it is necessary to keep a hotel of this type up to date, that most of the wall interiors and arrangements of the rooms, such as the lobby, dining room, bar, etc., are short lived, and that at the time the allocation was made he believed that the amount of $399,240.41 allocated to the short-lived items referred to as "alterations" was proper in comparison to the price paid for the building. He testified that he was familiar with this particular hotel, that since 1946 he had been engaged in operating hotels, that he felt that he knew something about the items that go into making up the value of hotel properties, and that he was familiar with the costs of constructing, remodeling, repairing, and operating hotels. We do not doubt the honesty and sincerity of the witness. However, he did not qualify as an expert on the value of hotel properties and did not express an opinion as to the fair market value of any of the individual items making up the hotel property which was purchased. His testimony amounts to no more than a conclusion upon the basic question here involved. The allocation was made on the basis of book values (depreciated cost), which we cannot assume represented fair market values. In the absence of evidence as to the fair market values of the various items, or at least of the "alterations," we must conclude that the petitioners have not met their burden of showing that the respondent was in error in holding that only $299,240.41 represented the proper amount of the purchase price allocable to the alterations or improvements. We accordingly approve the respondent's determination of the depreciation allowance.

*Decisions will be entered for the respondent.*