Samuel Segel and Margaret D. Segel v. Commissioner.
Segel v. Commissioner
Docket No. 1239-64.
United States Tax Court
T.C. Memo 1965-221; 1965 Tax Ct. Memo LEXIS 109; 24 T.C.M. (CCH) 1131; T.C.M. (RIA) 65221; August 13, 1965
Gerard R. Gemmette, for the petitioners. Robert D. Whoriskey, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1958, 1959, 1960, and 1961 in the amounts of $678,84, $3,723.73, $19,103.49, and $2,793.01, respectively, and additions to tax for the calendar year 1960 under the provisions of sections 6653(a) and 6654 of the Internal Revenue Code of 1954 in the amounts of $955.17 and $55.35, respectively. The issues for decision are (1) Whether the gain realized by petitioners upon the sale of two tracts of *110 land was ordinary income or long-term capital gain, and (2) whether certain documents given to petitioner Samuel Segel by several individuals for commissions on the sale of property constituted notes in payment of the commissions includable in petitioner's income in their face amount or any portion thereof in the year given or whether these documents were merely evidences of the agreement of the makers to pay the amounts stated as commissions to petitioner at a future date. Findings of Fact Some of the facts have been stipulated and are found accordingly. Samuel and Margaret D. Segel, husband and wife residing in Utica, New York, filed joint Federal income tax returns for the calendar years 1958, 1959, 1960, and 1961 with the district director of internal revenue at Syracuse, New York. These returns were filed on the cash receipts and disbursement method of accounting. Samuel Segel (hereinafter referred to as petitioner) is and was during the years here in issue a licensed real estate broker with offices in Utica, New York. Petitioner had worked in the real estate business for a period of approximately 20 years. He is listed in the Utica telephone book as a realtor. For approximately *111 10 years prior to the date of the trial of this case in March 1965, petitioner's principal business activity was the listing for sale and procuring of purchasers for property for use as filling stations, office buildings, manufacturing plants, and other business types of property. Prior to that time he had listed residential properties for sale. Generally, petitioner did not own and did not take title to the properties he listed but received a commission for his services in selling them. On July 26, 1957, George H. Burton conveyed by warranty deed certain real property fronting on the easterly side of the intersection of Keyes and Herkimer Roads, Utica, New York, to petitioner. This property was located directly across Keyes Road from property owned at that time by Sarah K. Appleton (hereinafter referred to as the Appleton tract). Petitioner had a reputation in Utica for finding locations to be used by oil companies as gasoline stations. Petitioner visualized a gasoline station on the property which Burton deeded to him on July 26, 1957. Upon inquiring about the lot, he found it was zoned residential. Petitioner had been approached by representatives of several oil companies who *112 were interested in acquiring this lot for the purpose of building a filling station thereon. Petitioner considered it difficult to obtain a zoning change from residential to commercial in Utica and the use of property for a filling station required a commercial zoning. Petitioner approached Rufus P. Elefante (hereinafter referred to as Elefante) with respect to obtaining a zoning change for this property. Petitioner entered into an agreement with Elefante that if Elefante would obtain a change in zoning of the property from residential to commercial, petitioner would split the profit to be made by purchasing the property for resale with Elefante. A zoning change from residential to commercial was made on the property. On September 10, 1957, petitioner by warranty deed conveyed the property at the intersection of Keyes and Herkimer Roads to Tremarco Corporation. A profit of $5,133 was realized by petitioner and Elefante from this transaction and shared equally by them. The price at which petitioner sold the property to Tremarco was approximately $25,000. The standard real estate commission for sale of undeveloped acreage in Utica was 10 percent. Under date of December 16, 1955, petitioner *113 conveyed by warranty deed property located on Genesee Street in Utica to Louis Kowalsky and Morton Kowalsky. Included in the description of the property contained in the deed was the recitation that it was the same property conveyed to petitioner by Harold Samuel Slater and Florence Lillian Slater by warranty deed dated December 2, 1955. Petitioner received for this property from the Kowalskys the same amount he paid to Slater for the property. The Kowalskys did not want to approach the owners of the property directly and petitioner purchased the property with the intention of reselling it to the Kowalkys at the price he paid for it as a favor to the Kowalskys. By warranty deed under date of July 28, 1958, petitioner conveyed to Wm. F. Hayes Sons Fuel Corporation a tract or parcel of land situated in Utica. The deed recited that this property was the same premises conveyed to petitioner by Herman Caro by a deed which was being executed concurrently with petitioner's deed to Wm. F. Hayes Sons Fuel Corporation. Wm. F. Hayes Sons Fuel Corporation operated a coalyard on this property and desired to purchase the property. Petitioner purchased the property with the intention of selling *114 it to Wm. F. Hayes Sons Fuel Corporation at a profit and did sell it to that company at a profit. On or about September 18, 1957, petitioner and Sarah K. Appleton executed a purchase offer relating to the Appleton tract which consisted of 23 1/2 acres of land fronting on Herkimer Road in Utica, New York. The purchase offer fixed a price of $23,500 for the land, $3,000 to be paid upon acceptance of the offer, and the balance to be paid by executing a mortgage in the amount of $20,500, with payment of the $20,500 to "be made within thirty (30) days after September 8th, 1958, or Sarah K. Appleton may elect to have the said mortgage paid to her in annual installments of not less than $7,000 on the 31st day of October 1958, 1959, & $6,500 on Oct. 31, 1960, and which said mortgage shall bear interest at the rate of 5% per annum from and after September 8th, 1958." The offer also provided that Sarah K. Appleton would release any portion of the tract from the lien of the mortgage upon payment of $1,000 per acre, the purchaser to be given credit toward such releases for all payments under the contract. On or about October 24, 1957, Sarah K. Appleton conveyed the Appleton tract to petitioner *115 by warranty deed. This deed provided for the reservation from the conveyance of a spring of water and the water course, specifically described therein, and also provided that the premises were conveyed subject to a lease "entered into between Sarah K. Appleton and Joe Castardi under date of September 8th, 1952 and which said lease will terminate on September 8th, 1958." There was also a reservation of the right of Sarah K. Appleton to use certain buildings on the property. On June 17, 1958, petitioner executed a quitclaim deed dedicating certain portions of the Appleton tract to the city of Utica, New York, for street purposes. On September 10, 1958, Sarah K. Appleton executed a release of the rights she reserved in the deed with respect to the spring, rights-of-way and easements across the property, and a part of the rights with respect to the buildings. By warranty deed executed September 12, 1958, petitioner conveyed the Appleton tract to Savage Homes, Inc., a New York corporation with its principal office in Utica, New York. The president of Savage Homes, Inc., was William C. Morris. Petitioner had known Morris for many years and was friendly with him. Petitioner knew that *116 Morris made a specialty of the development of subdivisions. Prior to the time petitioner acquired the Appleton tract a plot plan or plat had been made of the property. The price paid to petitioner for the Appleton tract by Savage Homes, Inc., was $77,000. Petitioner and Savage Homes, Inc., entered into an agreement which recited, "THIS AGREEMENT [was] entered into this 12 day of Sept., 1958, by and between SAMUEL SEGEL, * * * and SAVAGE HOMES INC., * * *." This agreement contained, among others, the following provisions: 1. The OWNER hereby agrees to sell to the BUILDER and the BUILDER hereby agrees to purchase from the OWNER the afore-described REAL PROPERTY which the OWNER, as part of the consideration herein, hereby agrees to improve and develop into eighty-seven (87) residential building lots in compliance with the rules, regulations and directives of the City of Utica, Veterans Administration, Federal Housing Administration and other governmental authorities and in accordance with the following: (a) Furnish all necessary and required surveying and engineering including all necessary maps in connection therewith; (b) The general plan and layout of the said REAL PROPERTY *117 with respect to roads, number and size of lots shall be as shown on the map attached hereto and made a part hereof entitled "Map of KEYES MANOR located in the City of Utica, N. Y." dated June 10, 1958 and made by Leo E. Wheeler, L.S. (Lic. No. 4938)and approved by Victor Brendes, Deputy City Engineer on June 11, 1958; (c) Each building lot shall be not less than one (1) foot nor more than three (3) feet above the grade of the finished road; (d) The four corners of each lot shall be properly marked by stakes duly set by a duly licensed land surveyor or civil engineer; (e) All roads in said REAL PROPERTY shall be duly constructed to meet all requirements of the City of Utica, Veterans Administration, Federal Housing Administration and shall be duly dedicated; (f) It is understood a small creek runs across the northeasterly corner of the said REAL PROPERTY. The OWNER hereby agrees to reroute the said creek along the northerly boundary line of the said REAL PROPERTY to Keyes Road; (g) City of Utica Water Mains (and Storm Sewers, if necessary) shall be duly extended into and throughout the said REAL PROPERTY; (h) All building lots in said REAL PROPERTY shall be approved by the *118 City of Utica for erection thereon of pre-fabricated National Homes; and, (i) All City Ordinances shall be duly enacted in order to furnish and supply the said REAL PROPERTY with the aforesaid required roads, water mains, storm sewers and sanitary sewers. (It is, however, agreed and understood that the BUILDER shall, at his own cost and expense, install the sanitary sewers within said REAL PROPERTY and shall assume the cost of the sanitary sewer which shall be constructed along Keyes Road adjacent to the said REAL PROPERTY.) 2. The total and full consideration for the said REAL PROPERTY, completely developed as hereinabove set forth, to be paid by the BUILDER to the OWNER shall be $77,000.00. * * *
4. It is hereby agreed that the OWNER will perform all of the conditions of this Contract on his part to be performed on or before September 9, 1958, at which time this Contract shall be consummated as herein set forth; * * * Petitioner did not pay Sarah K. Appleton the full balance of the purchase price of the property by October 31, 1958, and Savage Homes, Inc., took the property subject to that mortgage, which mortgage contained provisions with respect to the release of lots *119 upon partial payments. Certain lots were released in accordance with this agreement prior to September 9, 1959, when petitioner made the final payment on the mortgage to Sarah K. Appleton. Petitioner, at some juncture, entered into an agreement with Elefante whereby he agreed to split the profits on the sale of the Appleton tract with Elefante. Petitioner had been advised to contact Elefante and that Elefante could do the necessary preliminary work to satisfy Savage Homes, Inc., so that the tract could be used for development. Petitioner spent $1,310 for a property survey and staking out streets in the property. Petitioner disbursed one-half of the net profits from the sale of the Appleton tract to Elefante. Petitioner had an agreement with Savage Homes, Inc., for the release of lots upon payment of a certain portion of the selling price. Petitioner received the final payment for the property from Savage Homes, Inc., on September 10, 1959. Under date of February 6, 1959, petitioner executed an agreement to purchase approximately 27 acres of land located in Utica, New York, owned by George H. Burton (hereinafter referred to as the Burton tract) for the sum of $27,000. This agreement *120 provided for a mortgage to be given for $24,000 of the purchase price with the principal sum to be payable 2 years from the date of the mortgage and interest at 5 percent payable semiannually. The agreement further provided that the seller would surrender and release a home building lot upon payment of $500. On February 9, 1959, petitioner assigned one-half of his interest in this contract to purchase to Elefante. On May 12, 1959, Burton executed a warranty deed transferring the Burton tract to petitioner, and on the same date petitioner executed a mortgage to George H. Burton covering this tract, which mortgage contained provisions in accordance with the agreement of February 6, 1959, including the right to have a lot released upon payment of $500. On June 3, 1959, petitioner executed a quitclaim deed dedicating certain portions of the Burton tract to the city of Utica for street purposes. On June 25, 1959, petitioner executed a deed granting an easement to the city of Utica to construct and maintain a storm water sewer across the Burton tract. On June 1, 1959, John C. Clarke completed a subdivision map of the Burton tract which was filed with the office of the Clerk of *121 the County of Oneida on September 21, 1959. The map contained 93 numbered lots and some unnumbered lots, the unnumbered lots being located across the Utica, New York line in the town of Deerfield, New York. Under date of September 9, 1959, petitioner and Savage Homes, Inc., executed an agreement that Savage Homes, Inc., would purchase the portion of the Burton tract located in Utica from petitioner for a total consideration of $82,305. This agreement recited that petitioner was in the process of having all of the surveying and engineering services performed in order to properly develop the tract into 93 residential building lots which would meet with the approval of, and be acceptable to, the city of Utica, Veterans Administration, Federal Housing Administration, and other governmental authorities. As part of the consideration of this contract of purchase and sale, petitioner also agreed to improve and develop the property into 93 residential building lots in compliance with the rules, regulations and directives of these authorities, to furnish the necessary surveying and engineering services and the general plan and layout with respect to roads and number and size of lots, to reroute *122 a small creek on the property, that the lots should be approved by the city of Utica, that the water mains (and storm sewers, if necessary) of the city of Utica should be extended throughout the property, and that city ordinances should be enacted to supply the property with roads, water mains, storm sewers and sanitary sewers with the understanding that the purchaser should install the sanitary sewers at its own expense. On June 14, 1960, petitioner executed a warranty deed transferring the Burton tract, with the exception of the few lots located across the line in the town of Deerfield, New York, to Savage Homes, Inc. On June 14, 1960, Savage Homes, Inc., executed a mortgage to petitioner for the full purchase price of the 93 lots of the Burton tract of $82,305. This mortgage contained a provision for the release of a lot upon the payment by Savage Homes, Inc., to petitioner of $900. The portion of the Burton tract not transferred by petitioner to Savage Homes, Inc., was retained by petitioner until December 27, 1963, when he conveyed it by warranty deed to Pat Cerminaro. Savage Homes, Inc., paid petitioner for the Burton tract property transferred to it $10,800 on September 6, 1960, $11,700 *123 on September 21, 1960, $22,500 on October 19, 1960, and $38,700 on November 9, 1960, of which petitioner on November 21, 1960, refunded $1,400 as an overpayment. Of the amount received by petitioner from Savage Homes, Inc., petitioner distributed $31,600 to Elefante. Petitioner, at the time of his purchase of the Appleton tract and at the time of his purchase of the Burton tract, would have been able to arrange the financing of the mortgage payments as they came due had he not sold each of the properties prior to any principal payment under the mortgage he had given thereon becoming due. During 1954 petitioner acted as a broker on the sale of real property and became entitled thereby to certain commissions. Between 1954 and 1960 these commissions were paid in part by the purchasers of the property, Samuel J. Grossman and Harry Lasher, who had assumed liability for the commissions on the transactions. In 1960 the balance still due and owing on these commissions was $15,200. At the time Grossman acquired the property it was encumbered by a second mortgage and Grossman was unable to pay both the second mortgage and petitioner's commissions. In order for the sale to be effected, *124 Grossman and petitioner agreed that the full amount of petitioner's commission would not become immediately payable. On July 7, 1960, Grossman issued to petitioner a note in the face value of $7,700 payable in three installments of $2,566.67 each. These installments were to be paid in 3 consecutive years following the issuance of the note. Petitioner and Grossman agreed at the time the note was given to petitioner that the note would not be negotiated, assigned, or discounted. The note was not interest bearing. On September 30, 1960, Grossman and Lasher issued a note agreeing to pay petitioner $7,500 in four payments of $1,875 each. This note was also non-interest-bearing and petitioner agreed with Grossman and Lasher that he would not assign, discount, nor negotiate this note. On June 23, 1961, petitioner received a promissory note in the face amount of $4,500 from Edward J. and Marian F. Kinney. This note represented petitioner's real estate commission on the sale of certain property. The note contained no provision for payment of interest. It showed a due date of June 23, 1962, and had written on it that it was renewable. Petitioner received a $1,000 payment on this note on *125 December 6, 1961. On August 1, 1961, petitioner received a promissory note in the amount of $1,000 representing the real estate commission on the sale of certain real property. This note was not interest-bearing. Petitioner agreed with the makers of both the $4,500 note and the $1,000 note that he would not negotiate, assign, nor discount the notes. Petitioner on his income tax returns for the years 1959 and 1960 reported the portion of the gain from the sales of the Burton and Appleton tracts which he did not disburse to Elefante as long-term capital gain and on his 1960 and 1961 income tax returns did not include in commissions received any portion of the Grossman, Grossman and Lasher, or Kinney notes or the August 1, 1961 note for $1,000 he received except the amounts which had been paid thereon. Respondent in his notice of deficiency determined that petitioner received ordinary income from the sales of the Burton and Appleton properties and also determined that petitioner's income should be increased in 1960 by $15,200 representing the face amount of the Grossman and Grossman and Lasher notes and in 1961 by $4,500 representing the $5,500 face amount of the two notes received *126 in that year less the $1,000 payment he reported. Respondent also increased petitioner's income in the year 1961 by the amount of payments received on the Grossman note even though he had included the full amount thereof in petitioner's income for the year 1960. Opinion The first issue in this case is whether the gains on the sales by petitioner of the Appleton and Burton tracts are taxable as ordinary income or capital gain. The resolution of this issue requires a determination of whether petitioner held these properties primarily for sale to customers in the ordinary course of his trade or business within the meaning of section 1221(1) of the Internal Revenue Code of 1954. [1]
*127 The facts in this case show that petitioner was in the real estate business and that most of his transactions consisted of making sales for commissions. The record discloses three occasions prior to the sale of the Appleton and Burton tracts in which petitioner had himself purchased property for an undisclosed principal and sold the property to that principal, in two instances, at an increased price which took the place of his commission and which he apparently regarded as ordinary income. In one of such sales petitioner was associated with Elefante, the same individual with whom he was associated in the sales of the Appleton and Burton tracts. Petitioner contends that the fact that he was engaged in the trade or business of selling real estate does not prohibit his holding certain property for investment "in such manner as to benefit from capital gain treatment of gains made upon the sale of such other property." Eline Realty Co., 35 T.C. 1 (1960). Petitioner further contends that even if he is considered as holding the Appleton and Burton tracts for sale, this fact does not remove the properties from the category of capital assets unless the properties were held *128 for sale to customers in the ordinary course of his trade or business. Scott v. United States, 305 F. 2d 460 (Ct. Cls., 1962). It is petitioner's position that he was not in the trade or business of selling acreage as a principal and therefore he is entitled to treat the gain from the sales of the Appleton and Burton tracts as capital gains. The cases dealing with the question of whether real property is held by a taxpayer primarily for sale to customers in the ordinary course of his trade or business are numerous. As we have stated in many cases, the determination of this question must ultimately rest upon a consideration of the facts in the particular case. The nature of the acquisition of the property, the frequency and continuity of transactions over a period of time, the substantiality of the transaction, the activities of the seller with respect to the property such as the extent of his improvements thereto or his activity in promoting sales are among the facts to be considered. The ultimate question is not the purpose for which the property was acquired but the purpose for which the property was held at the time of sale. Estate of Peter Finder, 37 T.C. 411, 418 (1961). *129 Petitioner argues that any development that occurred on the Appleton and Burton tracts such as surveying and staking, was controlled and supervised solely by Elefante, who received 50 percent of the net profits in return for these services. From this petitioner concludes that under the decision in Smith v. Dunn, 224 F. 2d 353 (C.A. 5, 1955), this circumstance is persuasive that the property here was not held by him primarily for sale to customers in the ordinary course of his trade or business. Although the Court, in Smith v. Dunn, supra, concluded that the taxpayer there involved was entitled to report the gain from the sale of subdivided land which a number of years prior to the date of sale had been inherited from his father, as capital gain, the statements of the tests to be used in making the determination are such that they point to a different conclusion in the instant case. One of the tests stated by the Court in that case is the reason, purpose, and intent in the acquisition and ownership of the property and the duration of such ownership. Another test stated therein is the extent of subdividing, developing, and advertising to increase sales. *130 In the instant case the amount shown as spent on development of the property, unless the 50 percent of the profits that were to go to Elefante could be so classified, is relatively small. However, the large difference in the price petitioner paid for the property and the amount he received for it less than a year later suggests that the property was specifically acquired by petitioner for the purpose of having Elefante develop it to the point that city sewers and water would be available and proper zoning obtained for the builder to build the type houses he desired to build, in order to substantially increase the amount that could be obtained upon a resale of the property. In fact, there are suggestions throughout the record that at the time petitioner purchased the Appleton tract and at the time he purchased the Burton tract, he had the intent and perhaps even some specific general understanding that the property would be so developed as to make it usable by Savage Homes and that Savage Homes would then purchase the property. When petitioner was asked when he first approached Morris, the president of Savage Homes, about selling him the Appleton tract, he never directly answered *131 the question and his testimony left some inference that possibly there had been discussion even prior to the time petitioner purchased this tract. [2]
*132 Petitioner assigned one-half of his interest in the contract to purchase the Burton tract to Elefante 3 days after he entered into the contract with George Burton. Petitioner's reason for agreeing to split the profits on the Appleton tract with Elefante was so that Elefante could put the property in condition to be suitable for sale to Savage Homes, Inc., and the inference is that the same reason motivated petitioner in assigning to Elefante a one-half interest in his contract to purchase the Burton tract. These facts, considered in conjunction with other evidence of record, create an inference that petitioner purchased both properties for the purpose of developing them and selling them to Savage Homes, Inc. The record does not show exactly when petitioner entered into his agreement with Elefante as to the Appleton property but does show that Elefante was the person with whom petitioner had made an agreement in 1957 that in return for Elefante's getting certain property zoned commercial petitioner would pay him one-half of the profit he made by purchasing this property and reselling it to a company for erection of a filling station thereon. The record likewise shows that upon purchase *133 of the Appleton as well as the Burton tract, petitioner made arrangements to have lots released from the mortgage he gave to the seller as payments on that mortgage were made, indicating that he contemplated a resale of the properties prior to payment in full of the mortgage. Petitioner sold the Appleton tract to Savage Homes, Inc., only a few days after termination of a lease on the property subject to which he had purchased the property. The contract for purchase of this property by Savage Homes, Inc., was obviously drafted sometime prior to the date it was executed on September 12, as shown by the crossing out of the word "August" in the beginning of the contract and substituting the word "September" as well as the reference in the contract to certain action being taken by September 9, one day after the expiration on September 8, 1958, of the lease subject to which petitioner had taken the property. Petitioner testified as follows with respect to his motives in purchasing the Appleton tract: Well, being familiar with the City of Utica, and knowing conditions, I surmised, or I could visualize that this was a valuable tract of land for development. Having that in mind, I made Mrs. *134 Appleton an offer to purchase it for an investment. Petitioner testified that he could have financed the purchase of the property without reselling it and he makes no contention that he resold it within a short time after its purchase because of being unable to finance it. From all the evidence we conclude that petitioner purchased both the Appleton and Burton tracts with the definite intent to sell the property at a profit as soon as feasible after the expiration of the 6-month period necessary to cause the gain on the sale of a capital asset to be taxed as long-term capital gain. We also conclude that at the time of the sale of these properties petitioner held them for sale to such a prospective purchaser as would pay his asking price or to a "customer." There remains the question of whether petitioner was in the trade or business of selling this type of property. Petitioner's trade or business was that of a real estate broker and though generally his sales were made for a commission paid either by the purchaser or seller of the property he had on some occasions bought property for the purpose of making a resale thereof to a known individual, or as petitioner chooses to state, *135 acted in the purchases as "an agent for an undisclosed principal." The selling of property was certainly the major trade or business of petitioner. In the course of this business he sometimes acquired property with the intention of reselling such property. The reasonable conclusion from the record is that property so acquired by petitioner was held by him for sale to customers in the ordinary course of his trade or business. We also conclude from the evidence here that petitioner acquired both the Appleton and Burton tracts for sale to customers in the ordinary course of his trade or business. One of petitioner's major arguments is that since the Appleton and Burton tracts were sold as units and not as individual lots, it follows that he did not hold the properties for sale to customers in the ordinary course of his trade or business. We have, however, held that the fact that a taxpayer disposed of a group of lots does not necessarily mean that the property was not held for sale to customers in the ordinary course of that taxpayer's trade or business. Donald J. Lawrie, 36 T.C. 1117 (1961). Petitioner has failed to establish that the Appleton and Burton tracts were *136 not held by him primarily for sale to customers in the ordinary course of his trade or business. We therefore sustain respondent in his treatment of the gains from these sales as ordinary income. The other issue in this case involves respondent's increase in petitioner's taxable income in the year 1960 by the amount of $15,200 which respondent determined represented notes received by petitioner in that year and the increase in petitioner's income in the year 1961 by the amount of $4,500 which respondent determined represented promissory notes in that face amount received by petitioner in that year less the $1,000 payment on one of the notes reported on petitioner's tax return. Respondent contends that it has long been settled that where a cash basis taxpayer receives for services, promissory notes that such promissory notes constitute payment for the property or income received to the extent of their fair market value, citing Wolfson v. Reinecke, 72 F. 2d 59 (C.A. 7, 1934) and other cases. Respondent also calls attention to his regulation which specifically provides that if a taxpayer is paid for services other than in cash, the fair market value of the property taken *137 in payment must be included in that taxpayer's income.[3] The question here is not whether as a matter of law notes received in payment for services are includable in a cash basis taxpayer's income at the time received but is whether the documents which petitioner received were notes received in payment of services or merely a written agreement with respect to the manner in which petitioner was to be paid the balance of certain commissions due to him. As we pointed out in Nina J. Ennis, 17 T.C. 465 (1951), a cash basis taxpayer does not receive income until he has received cash or its equivalent. As we stated in that case in determining what obligations are the equivalent of cash, the requirement has always been that the "obligation, like money, be freely and easily negotiable so that it readily passes from hand to hand." *138 The agreements which petitioner in the instant case had were without interest and the very nature of the documents which are involved in the year 1960 indicates that they were not intended to be negotiable. It was petitioner's testimony that there was a definite understanding that these documents merely reduced to writing the agreement of the amount of commissions he was to be paid and the dates when payments were to be made. One other witness testified to the same general effect. This witness was a signer of one of the instruments involved in the determination for the year 1960. Petitioner's testimony is that he agreed in each instance with the maker of the so-called note that it would not be negotiated, that he would not borrow money at a bank using the note as security, and that it was his understanding and the other parties' understanding that these instruments were merely written evidence of the amount of the commissions due to him. Under the evidence here presented we conclude that petitioner did not receive any of the notes here involved in payment of commissions but that these documents merely evidenced the understanding between petitioner and certain of his clients as *139 to when commissions would be paid. We therefore hold that petitioner did not receive income by reason of the receipt of the notes but did receive income as payments were made to him by the individuals who executed these agreements and in the amounts of the payments so made. Respondent has increased petitioner's income by payments on the notes when received in the years here involved and has not decreased petitioner's income as reported by eliminating payments reported by petitioner except the $1,000 reduction in 1961. Since we hold that the so-called notes were not payments, we sustain respondent in including in petitioner's income in the year received payments made on these notes. Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *↩
2. Petitioner in this regard testified as follows: "Q. When did you first approach Mr. Morris about selling the Appleton tract to him to, Savage Homes, Inc.? "A. Well, in the first place, I have known Mr. Morris many years. I knew his family. I knew his father and mother and so forth. I was friendly with Mr. Morris. Knowing that Mr. Morris made a specialty of development, of subdivision, naturally, he would be the first one I would approach. "Q. Approximately when was that? "A. I cannot tell you exactly offhand. * * *
"Q. How do you explain the sharp increase between your cost and the price at which you sold that property? "A. Well, in the first place, I think I bought it right; that is, if it had not been a bargain, I wouldn't have bought it. It bought it strictly originally because I could see a potential in the area. I didn't jockey the price with them. That is what they asked me for. When I contacted Mr. Morris, he voluntarily offered so much for that property. It wasn't a question of bargaining or auctioning it off. It wasn't a question of not agreeing on a price and so forth. We just simply agreed on that basis. "Q. Tell me this: Did Mr. Elefante's activities with the City have anything to do with the sharp increase in price; that is, the installation of sewers and so forth? "A. Oh, no, no, sir. "Q. What work did Mr. Elefante do to justify a division of the profits with him? "A. Well, it was his job, or his part of the deal, to iron out the property so Mr. Morris of Savage Homes could use it on the basis that Mr. Morris wanted it. Not knowing, never having had any experience with a development of any kind like that, I left it entirely up to Mr. Elefante."↩
3. Sec. 1.61-2(d)(1), Income Tax Regs. Compensation paid other than in cash - (1) In general. If services are paid for other than in money, the fair market value of the property or services taken in payment must be included in income. If the services were rendered at a stipulated price, such price will be presumed to be the fair market value of the compensation received in the absence of evidence to the contrary. * * *
(4) Stock and notes transferred to employee of independent contractor. Except as otherwise provided by section 421 and the regulations thereunder (relating to employee stock options) and § 1.61-15, if a corporation transfers its own stock to an employee or independent contractor as compensation for services, the fair market value of the stock at the time of transfer shall be included in the gross income of the employee or independent contractor. Notes or other evidences of indebtedness received in payment for services constitute income in the amount of their fair market value at the time of the transfer. A taxpayer receiving as compensation a note regarded as good for its face value at maturity, but not bearing interest, shall treat as income as of the time of receipt its fair discounted value computed at the prevailing rate. As payments are received on such note, there shall be included in income that portion of each payment which represents the proportionate part of the discount originally taken on the entire note.↩